IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 22, 2005 Session

## STATE OF TENNESSEE v. ARTHUR T. COPELAND

**Circuit Court for Blount County**
**No. C-11100   D. Kelly Thomas, Jr.**

---

**No. E2002-01123-CCA-R3-DD - Filed August 22, 2005**

---

The defendant, Arthur T. Copeland, was convicted by a Blount County jury of one count of first degree premeditated murder.  The jury found that the state proved one aggravating circumstance: The defendant was previously convicted of one or more felonies involving violence to the person. Upon its further finding that the aggravating circumstance outweighed the mitigating circumstances beyond a reasonable doubt, the jury sentenced the defendant to death.  In this appeal as of right, the defendant raises issues regarding the sufficiency of the evidence; the exclusion of jurors; an invalid indictment; the admission of certain testimony; the exclusion of expert testimony;  his right to testify in his own defense; the denial of due process; the denial of his motion for continuance; the denial of his motion to suppress; error by the trial court during voir dire; the denial of a change of venue; prosecutorial misconduct during closing argument in the guilt and sentencing phases; discovery violations by the prosecution; error in allowing the introduction of certain photographs; denial of a request for a special jury instruction; the failure to charge the jury on a self-defense theory; the refusal to disqualify the district attorney's office; the refusal to excuse trial counsel from post-trial representation of the defendant; the failure to grant a new trial based on newly discovered evidence; improper jury instructions; the denial of expert funding for development and use of mitigation evidence; the admission of photos of the victim; the cumulative effects of errors during the guilt and sentencing phases; and various constitutional challenges to the death penalty and to the statutory capital sentencing procedure in this state.  After review, this court concludes that reversible error attended the trial court's response to defendant's decision not to testify and that the death penalty in this case is disproportionate to the particular offense.  We therefore reverse the conviction and sentence.

### Tenn. R. App. P. 3; Judgment of the Circuit Court is Affirmed in Part,
### Reversed in Part, and Remanded.

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Randall E. Reagan, Knoxville, Tennessee; Gerald L. Gulley, Jr., Knoxville, Tennessee (on appeal); W. Phillip Reed, Maryville, Tennessee; and Robert W. White, Maryville, Tennessee (at trial), for the appellant, Arthur T. Copeland.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Alice B. Lustre, Assistant Attorney General; Michael L. Flynn, District Attorney General; Kirk Andrews, Assistant District Attorney General; and Edward P. Bailey, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## Factual Background

The defendant was convicted in the April 1998 murder of Andre Jackson in Maryville, Tennessee. Briefly summarized, the proof established that the murder was triggered by a rape that occurred in the Alcoa community where the defendant, the victim, and their friends frequently associated. On the afternoon of April 6, 1998, Lynn Porter reported being raped in her Alcoa apartment by two men whom she could not identify. At the time, Porter dated Reginald Sudderth. Upon learning of his girlfriend's rape, a visibly shaken Sudderth appeared at the Howe Street Park area of Alcoa and publicized to the usual group gathered there that he was offering a $10,000 "bounty" on the head of the person who had committed the rape, adding that "someone is going to die tonight." The proof further established that the defendant learned of and expressed interest in the reward money. Later that same evening, the defendant accompanied Sudderth and others to Maryville in search of the victim's residence, after concluding that the victim and his friend, Chris Knighton, were responsible for Ms. Porter's rape. After identifying the home where the victim lived, the defendant obtained a gun in Alcoa, and he and others returned to Maryville. The defendant entered the victim's home about 2:00 a.m. that morning and soon exited with the victim. Shortly afterwards, the homeowner heard gunshots, and the victim reentered the house alone where he collapsed from gunshot wounds and died. No direct evidence indicated who actually shot the victim. In addition to the defendant, Reginald Sudderth and two other men were later indicted for the victim's murder.

## Guilt Phase

### State's Proof

The state's first witness was Edna Delapp, who lived on Scenic Drive in Maryville, Tennessee, along with her daughter, Stephanie, and Stephanie's boyfriend, Andre Jackson. According to Delapp, her daughter had convinced her to allow Jackson to live with them over the previous 10 months because he was having problems at home and was trying to get in school and "back on track." Delapp recalled that on April 6, she was off from work. Jackson was also home and slept most of the morning. At about 1:00 p.m. that afternoon, Jackson briefly introduced her to Chris Knighton, a friend. Jackson left with Knighton, and Delapp did not see Jackson again until her daughter returned home with him at about 11:30 p.m. that night. About 2:00 a.m., Delapp was awakened by a "very insistent pounding" at the front door. She looked out the window and saw no cars in her driveway. The loud knocking continued. She looked through the glass panes and thought she recognized the person standing at the door as Knighton. She opened the door and angrily confronted the man about waking everyone. He entered and replied that he needed to talk to Jackson.

2

As they walked through the hallway and she was better able to see, Delapp stated that she realized the man was not Knighton. With the man following her, she opened the door leading down to Jackson's room and called his name, but Jackson did not respond. The man said, "I'll go get him" and walked down the stairs into Jackson's room. Delapp returned to her bedroom, looked out the window again, and saw no one. As she made her way back to the hall, she encountered Jackson following the man up the stairs. Delapp recalled that the man was wearing dark clothing and had "really weird hair" with "little twisted ponytails." She further noted his eyes, stating that they stared at each other for a few seconds and that she would "never forget him." She did not recall noticing his hands. She stated that the man and Jackson went out the front door. She again returned to her bedroom window but saw nothing. At the window, Delapp testified, she heard shots and glass shattering. She ran from her bedroom and collided with Jackson in the doorway to the hall. She described Jackson as being "hunkered down and running, just as fast as he could." Delapp stated that during the collision, she was knocked down and cut her forehead, which bled quite a bit. She ran to the living room, slammed the front door closed and tended to her forehead in the hall bath. Her daughter appeared, and the two went to Edna Delapp's master bathroom and found Jackson lying on the floor. He was wearing black and red tennis shoes at the time.

Edna Delapp identified photographs indicating bullet marks to her sofa, hardwood floors and the walls of the entrance to her home. She identified the defendant as the man that came to her home and called Jackson outside that night. Delapp observed that "his eyes were so intense, I'll never forget him." Delapp stated that later that night, she and her daughter went to the Maryville Police Department and gave statements. Delapp then went to the hospital and received approximately twenty stitches for the cut to her forehead. She stated that the next afternoon, she returned to the police department for a photographic lineup of suspects. She viewed six photographs and identified the man she saw at her home based on his eyes. Delapp noted that in July 2000, two detectives came to her house and observed the foyer area that led to the basement. She stated the area was lit with night lights, the same as it was the night of the murder.

On cross-examination, Delapp testified that following the advice of her boss and a friend, she had refused to talk with anyone from the defense team about the case. She stated that on the day of the murder, she briefly looked at Knighton as he stood in the foyer when he picked up Jackson. Regarding the man who came to her home at 2:00 that morning, she stated that she would not forget him because "we stared at each other for two full seconds" and had "eye-to-eye contact." Delapp described the lighting when she first saw him at the door, as "very bright outside," because the moon was nearly full and there was a lamppost in the carport area. She stated there was no conversation between the man and Jackson when they exited the house. Delapp agreed that at the preliminary hearing, she had testified that when she injured her head in the collision with Jackson, "I had so much blood on my face, I couldn't see." She stated that although there was a lot of blood over her left eye, she could still see out of her right eye. She noted that in her description to police that night, she recalled the man's dark clothing and his hairstyle and estimated that he was a little taller than her height of five-foot-six inches. She stated she also recalled the man's eyes but probably did not mention them. Delapp stated that she told the emergency room doctor that she had fallen at home because she was upset and embarrassed and did not want to explain that someone had just been

3

murdered in her home. She stated that the day after she identified the defendant in the photo lineup, she saw the same picture of him in the local newspaper with an article stating that he had been arrested and charged with murder.

Maryville Police Detective David Graves testified that he had been a detective for 10 years and specialized in the areas of crime scene processing and forensic art. In July 2000, Detective Graves and Detective Bill Manuel went to the Delapp home to view the lighting conditions inside as they were on the night of the murder. Detective Graves noted there were four lights on in the hallway area, three of which had 25-watt bulbs. He stated the lighting was not "real bright," but he could see quite well. He noted that he was able to identify various facial features of Detective Manuel from various distances and angles. Detective Graves further testified that it was less than one mile from the scene of the murder to the Gardenvale Apartments in Maryville. On further examination, Detective Graves agreed that he had worked with Detective Manuel and had seen him almost daily over the past 16 years.

Stephanie Delapp testified that on the day of the murder, she picked up Jackson at 6:00 p.m. in Alcoa, they returned home briefly, and she drove him back to Alcoa. At 11:30 p.m., Delapp picked up Jackson again and they went home and to sleep. She stated that she woke up about 2:15 a.m. upon hearing her mother screaming. She discovered her mother in a guest bathroom with blood running down her face. Her mother told her someone was shooting, and Stephanie Delapp retrieved a knife from the kitchen, not knowing who else was in the house. She went to the back bathroom and found Jackson. After police arrived, she and her mother were driven to the police station and gave statements. Stephanie Delapp testified that when Jackson called her the first time that day to pick him up, he did not say whether anyone was with him. When she arrived in Alcoa, Jackson was with Chris Knighton. She did not observe any gun or hear any discussion of a gun. Delapp conceded that when first questioned, she did not tell police she picked up Knighton along with Jackson. She explained that she lied because of the murder and because a "certain somebody," Knighton, was still roaming around. She was aware that shortly after the murder, Knighton was jailed and charged with rape.

Stephanie Delapp further testified that in December 1998, she violated the City of Alcoa curfew and was charged with possessing a loaded weapon. She testified that the weapon was inside the glove box of the car in which she was a passenger and that the charges were later dropped because the gun was not hers. She admitted that at the time she was already on juvenile probation for leaving the scene of an accident. Delapp testified that she believed Jackson sold drugs in Alcoa, although he had never taken or sold drugs in her presence. She testified that Jackson's mother, Diva Brown, had called the Delapp's home at around 8:00 p.m. on the night before the murder and told her that Lynn Porter had been raped. Delapp stated that Brown was concerned that Jackson had been involved in the rape. Delapp stated that she and her mother had never discussed whether Knighton may have been the person that came into their home on the night of the murder.

Maryville Police Sergeant Gary Nitzband testified that he was a detective on duty on the date of the April 1998 murder. He and three other officers were the first to arrive at the Delapp

4

residence. On their "walk-through," detectives observed the victim's body and damage from gunshots to the home. Eight empty shell casings from a semi-automatic weapon were retrieved in the home, three from the foyer area. The victim's body was found in a back bathroom with three apparent gunshot wounds to the groin area and above. Sergeant Nitzband testified that evidence collected at the crime scene included a very small quantity of tiny rock-like substances found in several locations in the victim's basement bedroom. He opined the substance was crack cocaine. A knife was recovered on the tub where the victim's body was found. Sergeant Nitzband testified that based on the information he had, there was no reason to attempt to recover fingerprints from the crime scene. After he left the Delapp residence, Sergeant Nitzband went to the nearby Gardenvale Apartments to speak to a woman named Karla Bragg. She answered the door and seemed "excited, scared." He informed Bragg they were investigating an incident nearby and obtained a statement from her.

On cross-examination, Sergeant Nitzband testified he did not question Edna or Stephanie Delapp at the scene. He was unaware whether anyone had been charged with a drug offense in connection with the substance found in the victim's room.

Karla Bragg testified that in April 1998 she lived at the Gardenvale Apartments in Maryville. Her boyfriend was Knighton. She stated that at about 2:30 a.m. on April 7, the defendant knocked on her door. He was wearing all black clothing, black gloves, and his hair was sticking up in "plaits" or little sections. The defendant said he was looking for Knighton. Bragg stated she noticed the defendant's gloves when he asked for a cigarette and couldn't light it himself. Bragg agreed that in her statement to police she stated that the defendant told her, "I really need to see him. He said, tell that –--- I will be back, and he asked me for a cigarette." Following Bragg's testimony that she did not actually remember the events of April 7, that she had "blocked it out," her April 7 statement to police was read into evidence. In further testimony, Bragg stated that she had known the defendant for years before the murder but could not recall whether the defendant or Knighton had been to her apartment that day.

Dr. David Gilliam performed the autopsy of the victim. He testified that the victim suffered three gunshot wounds to the front of the body. One bullet entered the collarbone from close-range and exited the back. Another entered the chest and also exited the back. Both wounds were fatal. A third gunshot to the groin was not fatal. Dr. Gilliam testified that a person could easily run 100 yards after sustaining these wounds before succumbing to the injuries. He stated that the wound to the groin would have been painful and caused the victim to bend over. He opined that if the shot to the groin occurred first, it could explain the downward trajectory of the other two bullets. He opined that the gun was in the range of a nine millimeter to .45 caliber weapon. The cause of the victim's death was massive blood loss and pneumothorax as a result of two of the gunshot wounds. His examination revealed that the victim was otherwise healthy. On cross-examination, Dr. Gilliam stated that he found no evidence of a head injury to the victim. He noted that TBI lab testing indicated the presence of marijuana in the victim's body.

Maryville Police Captain John McCullough testified that he went to the crime scene

on the morning of April 7 and spoke with Edna Delapp in an effort to get details of the night's event. However, Delapp was emotional and gave a statement with "minimal" information. He testified he did not get an accurate account of the perpetrator's movements in the home that he could duplicate at the scene. Captain McCullough testified that no gun tied to the murder was located. He stated that one theory police considered was that the murder was related to the drugs found in the victim's room. He stated neither Edna nor Stephanie Delapp was questioned about the drugs.

Detective Bill Manuel testified that he arrived at the murder scene and escorted the Delapps to the police station. At the station, the women were interviewed separately. Neither could identify the suspect. Edna Delapp described the person in her home as a black male, about five-feet-eleven inches tall, wearing dark clothing, and having little "horns" of twisted hair. Later that day, after the photographic lineup, Detective Manuel informed Edna Delapp that she had identified the person police suspected in the victim's shooting. He stated that Knighton was never a suspect in the victim's murder and was not included in the photographic array shown to Edna Delapp. He testified that the knife found near the victim was not sent for testing because Stephanie Delapp had indicated that she took the knife from the kitchen to the bathroom that morning. Detective Manuel stated that his interviews with the Delapps were not recorded although he did make brief notes regarding Edna Delapp's description of the suspect. He testified that he never pursued charges or questioned Stephanie Delapp about the drugs found in the victim's room.

Michael J. Lyttle, a forensic scientist with the Tennessee Bureau of Investigation Crime Lab in Nashville, testified that tests performed on blood samples from the victim indicated the presence of a marijuana byproduct used within 24 hours of his death.

Glen Glenn, also a forensic scientist with the Crime Lab, testified that of the rock-like substances collected at the scene, seven were ascorbic acid, or Vitamin C, and one was .03 grams of cocaine base. Mr. Glenn stated that it was common to find other substances mixed with cocaine.

Dan Royce, a firearms examiner with the Crime Lab, testified that the three bullets recovered from the crime scene were nine-millimeters, all fired from the same weapon. All eight shell casings were also fired from the same weapon, an automatic or semi-automatic gun that resembled a small submachine gun in appearance.

Lynn Porter testified that in April 1998 she was dating Stacey Sudderth. On April 6, she arrived home at 5:30 to find two males in her home. One was tall; the other, short. She described one as a light-skinned black man. Their faces were covered, both wore black clothing, and one wore red tennis shoes. They asked Porter to contact Sudderth, saying he "owed them money or something." One man instructed Porter to get $10,000 by 10:00 p.m. and place it in a clear plastic bag. She stated that he threatened her family and Sudderth's family. Porter testified that the shorter man then left the room and the taller man raped her. After the men left, Porter called Sudderth, and he and the police arrived at the same time. Porter went to the hospital and to the police station to give a statement. Sudderth remained with her for a time and later left her at her mother's home. Porter testified that Knighton was later convicted for his part in her rape.

6

On cross-examination, Porter testified that she and Sudderth had dated for ten years. She had also known David Bell Brown, a friend and employee of Sudderth, for over ten years. Porter stated that she had seen the defendant on occasion, but he was not a friend of hers or Sudderth. Porter testified that the men in her home gained access by kicking open the back door. She attempted to call Sudderth as they instructed but could not reach him. One man had a knife and the other had a gun. Her clothes were removed with a knife and her hands bound. During the rape, she observed that the perpetrator had light skin and a gold tooth. She was not aware whether Sudderth began gathering the money the men had demanded. Porter testified that she told Sudderth that she could not see the men's faces, but the rapist reminded her of a man named Toure Teeter. Porter agreed that at the police station, she stated that the rapist could have been the defendant. Porter stated that she had since come to believe that the murder victim, Andre Jackson, was actually the man who raped her, and Knighton was the man with him. She agreed that Knighton had been convicted even though she was never able to identify the race of the person accompanying the rapist. She testified that she never told Sudderth or anyone else that she knew for certain who had raped her.

Billy Williams testified that in April 1998 he lived in Alcoa. Between 5:00 and 6:00 p.m. on April 6, he was at the Howe Street Park, shooting dice with others, when Sudderth arrived along with Homer Henderson. Sudderth jumped out of a car, very upset, and began yelling at them, saying "you young mother f------ are wrong, . . . the $10,000 you came for, it's a bounty . . . a reward for your head." Williams stated that he asked Sudderth what he was talking about and Sudderth continued, "[T]he $10,000 you wanted, come get it, when I find out who done it, you're dead." Sudderth also told the group that one of the men he was talking about wore red Air Jordan tennis shoes. On further examination, Williams testified that he knew the defendant and did not see him in the park on April 6. He did recall seeing the victim and Knighton sitting on a bench in the park as Sudderth was yelling at the group.

Victor Hodge testified that on April 6, he was shooting dice at the Howe Street Park when Sudderth arrived there "real upset," with "tears running out of his eyes." He stated that Sudderth slammed his hand on the hood of his car, and hollered "you –----- got my attention . . . , you all had no business doing that to the girl . . . , and you all wanted ten thousand . . . I got ten thousand dollars." Later that night, Hodge went to "Jack's Place" to "hang out." People there were discussing "the situation." He recalled that the defendant and Brown were there. According to Hodge, the defendant asked him if he knew Sudderth's beeper number or how to contact Sudderth. Hodge stated that the defendant "just blurted out that he had to have that ten thousand and wanted to get in touch with Sudderth." On cross-examination, Hodge testified that on April 6, Porter's rape was the main topic of discussion in the community, and there was a lot of speculation and rumors as to who had committed the crime. Hodge recalled that Knighton was in the dice game that day, but he did not see the defendant or the victim at the park. Hodge stated that when he left Jack's Place about 12:30 a.m. that night, the defendant was still there. He recalled that the defendant normally wore his hair either in braids or in an afro. He did not observe the defendant with a gun that night. He agreed that Knighton and the defendant resembled each other when their hair was styled the same way.

Tyrone Haley testified that at the time of the defendant's trial, he was serving a sentence for a drug offense in the county jail. On April 6, 1998, he was shooting dice in the Howe Street Park. Haley stated that he knew the defendant and saw him that evening about 9:00 p.m. standing alone on the corner of Howe Street. He stated the defendant was dressed in all black clothing and was carrying a weapon with a long clip and a muzzle around the nozzle at his hip. On cross-examination, Haley stated that he was on probation for an earlier conviction for sale of cocaine when he incurred his current drug conviction. He acknowledged that he had refused to speak with the defense team regarding their case. He stated that he had had trouble with the defendant two years before when the defendant had robbed him of some gold and money. He stated he didn't report seeing the defendant on the night of the victim's murder to police because that same night the defendant threatened to blow his head off with a sawed-off shotgun. Haley stated that he was getting nothing in return for his testimony. He stated that the defendant had been carrying around the gun he saw him with for about a week before April 6. Haley stated that he told prosecutors for the first time about seeing the defendant with a gun on April 6 in the weeks prior to the defendant's trial. He stated that he agreed to talk with them, but not with defense counsel "because they are defending [sic] my friend that's dead and gone."

Kimani Dean testified that on the late afternoon of April 6, 1998, he was standing with friends on the corner of Howe Street when they noticed police cars at a nearby house. He later found out it was the home of Lynn Porter. Sudderth slowly drove by and said, "[Y]'all –––––– better watch out 'cause somebody is going to die tonight." Shortly before midnight, Dean was driving around and saw the defendant standing in a parking lot near Howe Street, talking with a girl named Giovanna Hodge. The defendant was dressed in all dark clothing, and his hair was plaited. Dean further testified that he was not a friend of the defendant but had seen him in Alcoa. Dean stated the victim was his cousin and that the two were close.

Dorinda Pitts testified that the defendant was a personal friend. She stated on the day before the murder, she and the defendant went to dinner in Knoxville, and they returned to Alcoa about 9:30 p.m. She dropped the defendant off at Kelvin Road and Howe Street. She later saw him again at about 11:00 p.m. in a car that looked like one that Homer Henderson drove. Pitts further stated that she was able to identify the defendant because he briefly exited the vehicle. She stated she did not observe Henderson, only a car that looked like one he drove.

Toure Teeter testified that he had prior drug convictions and was out of jail at the time of the defendant's trial. He stated that Stephanie Delapp and the victim were friends of his. On the night before the murder, he was at Jack's Place. Around 11:00 p.m., he saw the defendant in front of Jack's Place. He stated that the defendant was mad, "raising a lot of Cain," saying, "[y]ou all mother-f------- talking about I'm the one that went in Lynn Porter's house. You all got me f------ up. I'm going to go down in history tonight, somebody going to die tonight." Teeter stated he left and went to his grandmother's house because he was afraid of the defendant. In further testimony, Teeter agreed that the victim was his best friend. He also knew Knighton but did not hang out with him. Teeter stated that he received several phone calls from Knighton and the victim on April 6 when they were inside Porter's home asking him to bring them another gun. He did not take them a gun and

8

told them to leave Porter's home. Teeter agreed that he was hurt and angry about the victim's death. He stated Stephanie Delapp never discussed with him who may have killed the victim. He acknowledged that he was on community corrections for two 1998 drug convictions, had a conviction for felony reckless endangerment, and had given an incorrect social security number to Maryville police after being pulled over the same week he testified in the defendant's trial. He denied telling a defense investigator through his door that he did not want to talk about the defendant and that he wanted to see him "fried."

Myron Kellogg testified that he was a former drug dealer and had a conviction for delivery of a controlled substance, for which he received three years' probation. According to Kellogg, the victim sold enough drugs to make money to live on, and Knighton also dealt drugs. On the day before the murder, Kellogg was in Jack's Place and saw the defendant there along with David Brown around 11:30 p.m. He stated that the defendant "said he needed to make this money, he needed to get this over with, go on and do this." Kellogg stated Ashley James drove him home a little before midnight. After 1:00 a.m., Kellogg received a phone call from Brown. Sudderth also got on the telephone and asked Kellogg if he knew where Knighton and the victim were and where the victim's girlfriend lived.

The next morning, Kellogg saw Ashley James again and recalled that she was "hysterical" and "excited." According to Kellogg, James informed him that after she took Kellogg home the night before, she joined Henderson, Sudderth, Brown, and the defendant. Henderson wanted to know where James had dropped off the victim earlier in the week, and she gave him the victim's Scenic Drive address. The group went in two cars to Maryville with James, Henderson, and the defendant in one car, and Sudderth and Brown in the other. They drove near the victim's residence, and the defendant got out of his car and into the car with Sudderth and Brown. James stated that she and Henderson went to Kay's Ice Cream around the corner. While there, James heard gunshots. She also told Kellogg that she had seen guns before she and Henderson separated from the others that night.

On cross-examination, Kellogg testified that the victim was his friend and his cousin. He stated he had known James for about three years, and it was "possible" they had used drugs and had a sexual relationship together. He had seen James use cocaine, was aware that she had been in a drug rehab program, and had provided her a place to stay when she could no longer stay with her parents. Kellogg testified that he first reported that he knew that Sudderth, Henderson, Brown, and the defendant planned to kill the victim in late 1999. He stated he decided to tell a police officer who had previously arrested him for possession of drugs about the victim's murder. He stated he received nothing in exchange for the information. He stated he also tried to convince James to tell police what she knew, but she had initially refused. In June 2000, Kellogg accompanied Detective Manuel to the department store where James worked so that she could give him her information about the victim's murder. Kellogg agreed that he had slept with James once before the murder and a few times more recently. Besides the police officer, Kellogg stated he also discussed the murder with the district attorney and Detective Manuel. He could not recall whether any of his discussions had been recorded.

9

Although involved in an unrelated murder case in which he admitted going to Atlanta with a friend and bringing back $30,000 worth of cocaine to Blount County, Kellogg stated that he received nothing in exchange for his testimony in the present case. He stated that he was testifying against the defendant because he felt that if the victim had committed a crime, the courts, and not the defendant, should have punished him. He felt that the victim did not deserve to die. He stated James would not come forward earlier because she was afraid of Sudderth. Kellogg testified that he was never charged with drug offenses as a result of his testimony in another case; however, he did incur a probation violation. He stated he gave testimony in that case because one of the victims was his friend.

Margaret Amason testified that in April 1998 she lived in Alcoa with her boyfriend, David Brown, and her daughter. On April 6, the day Porter was raped, Amason went to bed and was awakened around midnight by Brown and the defendant playing music and laughing in her living room. She stated she knew the defendant pretty well, that he was friends with her and Brown, and that he came to her house often. She stated she went into the kitchen and found the defendant rolling marijuana "blunts" and Brown making sandwiches. She was aggravated and instructed them to leave. The next morning, she awoke and discovered Brown sitting on the bed, tying his shoes. On cross-examination, Amason stated that Brown was still her boyfriend, but he was currently incarcerated. She testified that it was normal for the defendant to visit her home socially, and there was nothing unusual about the defendant and Brown coming over that night, although she did not like them making a mess in her kitchen.

Michael Curtis testified that on April 7, 1998, he left his sister's house in Alcoa around 11:00 p.m. to take a friend home. He saw the defendant in a black "Sidekick" that he recognized as belonging to Henderson's wife. Henderson was driving and there were two females in the car. Curtis stated he was a friend of the defendant and stopped to talk with him. Curtis did not recall anything unusual about the defendant's appearance but noted that the defendant dropped a black glove with glitter on it in Curtis' car. He did not recall seeing the glove before and did not observe a second glove. Curtis stated that the defendant wanted to discuss getting back together with Curtis' sister who had recently broken up with the defendant. Curtis agreed that the defendant was wearing his hair in four braids that night, two in the front and two down the back. The defendant did not appear to be intoxicated. Curtis noted that the next day, he saw Knighton, who was wearing his hair in four braids identical to the style the defendant was wearing the night before.

Robyn Rainer testified that in 1998 she lived in Alcoa and was a friend of Knighton. On April 6, the victim dropped off Knighton at her house shortly before dark, and he went to sleep on her couch for the night. About 3:00 a.m., she awoke to find the defendant knocking on her front door. The defendant came in and reported that the victim was dead and told Knighton that he needed to leave. The defendant asked to spend the night at Rainer's house, but she declined, saying she had no more room. According to Rainer, the defendant responded that he would tell Brown to leave. The defendant then left and did not return. The next day, Rainer described Knighton as being very nervous, running if someone knocked at the door. She observed that Knighton had a gun. Rainer testified that she had drug convictions but had been through rehabilitation and had stayed off drugs

10

for the past four months.

On cross-examination, Rainer stated that when she went to bed about 1:30 a.m. on April 6, Knighton was on her couch and appeared to be asleep. She did not believe that he ever left her house that night. She stated that Knighton told her the next morning that he had left and returned during the night. Rainer stated she reported this information to Detective Manuel shortly after the victim's murder. She stated she did not know why a November 1998 drug charge against her was dismissed. She testified that she pleaded guilty to a December 1999 drug charge and after speaking to the state about the instant case, she was allowed to serve her eight-year sentence on Community Corrections. She recalled that when the defendant reported that the victim was dead, Knighton appeared more nervous than upset. In further testimony, Rainer stated that prosecutors did not help obtain her release from custody for her drug convictions.

Ashley James testified that in April 1998 she lived in Knoxville but frequently came back to Maryville. She often went to see Myron Kellogg. The two had an intimate relationship, and she used cocaine around him. On April 6, she and Kellogg went to Alcoa. There, she went to the Howe Street Park to drink beer and visit with friends, and he went to Jack's Place. Later, she went to a store and met Sudderth and Henderson. Henderson informed her that Porter had been raped, and they were looking for the victim and Knighton. According to Henderson, the victim or Knighton had raped Porter, and they needed to find them. James stated she left to pick up Kellogg, took him home, and returned to the store. When she got into Henderson's vehicle, he was holding a gun. He told her they were still looking for the victim and Knighton "because they had raped Lynn. And that [Sudderth] was his cousin and he wasn't going to let him down."

James stated that she rode with Henderson and Sudderth to pick up the defendant. The defendant got into the back seat with her and Henderson and Sudderth sat in the front seat. She recalled that the defendant was wearing a black sweatshirt. The group drove to Scenic Drive in Maryville. She stated that the defendant knew where to go because he had been to the victim's house to have speakers installed in his car. They drove down the street until the defendant identified a car parked in front of one house as that of Stephanie Delapp. The group left, took Sudderth to his truck, and picked up Brown. They drove to another house in Alcoa, Brown walked to a window, and someone handed him a gun. Still inside the car with the defendant, James stated that the defendant said that he needed to get some "cheese," or money, to get out of town. Referring to Brown, the defendant further stated that he didn't know why there was a "crack head" there, that he would "just mess everything up." Brown handed the gun to the defendant, and the group returned to pick up Sudderth. The defendant and Brown got into a car with Sudderth. James stated that she and Henderson left the others and drove to a motel in Knoxville, checking in before midnight.

At the motel, James stated that Henderson left about an hour after they checked in, telling her that he had been paged and would be "right back." He did not return until 8:00 a.m. Alone at the motel, James stated that she used a little cocaine, watched television, and went to sleep. The next morning, Henderson drove her back to her car and on the way told her some upsetting news. Back in Alcoa, James stated that she drove around for a while and was "distressed, disgusted

11

and upset." She stated that she went to Kellogg's house and told him about driving around with the men the night before, that they obtained guns, that she went to the motel with Henderson, and that he had left her there until the next morning. She stated that although she was a cocaine addict at the time, drug use did not affect her memory or cause her to hallucinate.

On cross-examination, James testified that she met Kellogg in 1997 and began a relationship with him. She admitted that Kellogg paid her expenses and supplied her with drugs but denied that she had sex with him in exchange. She stated she also had a relationship with Henderson, although she knew he was married. She stated that April 6 was not the first time she had stayed with him at a motel. According to James, when she drove to Scenic Drive with Sudderth, Henderson, and the defendant earlier that night, she did not give them any directions to the victim's house. She stated she believed that Stephanie Delapp drove a white car but recalled that the defendant had pointed out a silver Sidekick as the car they were looking for. Shown a photograph of a black Sidekick with a white roof, James stated that she was mistaken that the car the defendant identified was silver. She agreed that there was a lot she did not remember accurately anymore. After leaving the motel the morning of April 7, James stated that she drove around for a while and hung out with friends. Everyone was talking about the murder. She stated she did not tell anyone about being with Henderson or Sudderth the night before. She went to Kellogg's house after lunch, had a few shots of liquor, and told him everything that had happened the pat night.

James denied that Henderson persuaded her to show him the address where she had dropped off the victim earlier in the week. She further denied that she and Henderson went to Kay's Ice Cream on April 6 or that she heard gunshots fired nearby. She stated in November 1998 that Kellogg had some charges pending in Blount County and told her that she needed to help him get out of trouble. It was during this time that Kellogg first asked her to come forward and tell police about the events of April 6. James stated that she first learned that the victim was dead when Henderson told her the morning of April 7 as they left the motel. She stated she cried. She was aware that the victim was Kellogg's cousin. She stated that she did not help plan the victim's murder or help the others locate him. Her purpose in being with the others on April 6 was that Henderson planned to use her as an alibi witness. James denied making up all of her testimony in an effort to keep Kellogg out of jail because she needed him to supply her with drugs. James stated that she made a mistake in not calling anyone about the murder plan when Henderson left her alone at the motel on April 6. She explained that she did not tell anyone later because Sudderth had threatened her the next day and she was scared for her life. James stated she had not been charged with any crime in connection with the murder and had made no deals with the state. She did not know who returned to the victim's residence later that night and did not know who actually shot him.

Danny Wilburn testified that he was on patrol with the Blount County Sheriff's Office on the morning of April 7, 1998, when he was dispatched to an address on Alcove Boulevard. There he found the defendant lying on the front porch. The defendant was hurt, could barely speak, and reported that he had been shot in the upper buttocks by a "Bella" or David and another male who were in a green Toyota 4-Runner. Wilburn noted that the defendant's hair was tightly braided around his head.

12

Patrol Officer Rusty Borden, of the Blount County Sheriff's Department testified that he stopped a green 4-Runner on April 7 near the Foothills Mall in Maryville. Sudderth was the driver, and Brown was his passenger. A gun was found on the passenger floorboard, and a $10,400 roll of cash was found in the console.

The state rested its case-in-chief.

Defendant's Proof

Beverly Black testified that Henderson was her son-in-law and that she was Kellogg's next-door neighbor. She testified that Kellogg often came to her house, and she treated him like a son. She stated that two months before the defendant's trial, Kellogg came over, and she asked him whether he was working or still selling drugs and whether his drug charges were still pending. Kellogg responded that he was not going to jail because he had made a deal that he would testify to what police wanted to hear about the victim's murder, and he would make sure that James did the same. According to Kellogg, James would not be charged with conspiracy in the murder. Black stated that Kellogg also told her that the police had taken $30,000 worth of his cocaine, and he needed to make up that money. Black stated she knew that Kellogg lied a lot and did not believe the police had his cocaine.

On cross-examination, Black stated that when Detective Manuel called before the trial, she told him that Kellogg had told her he had made a deal, but the detective made no comment. She admitted that this was a few days after Henderson, her son-in-law, had been indicted in the victim's murder. She stated she never told anyone else what Kellogg had said because she assumed he was lying. She admitted that she was aware that Ashley James was her son-in-law's lover, but she stated that the issue was between her daughter and Henderson. Black stated that after hearing Kellogg's testimony, she approached defense counsel because she was "appalled" by the lies she heard from Kellogg.

Cathy Kivett testified that on the morning of April 7, 1998, there was a knock at her door, and she found the defendant on the front porch. He was holding his side, told her that he had been shot, and asked her to call for help. She described the defendant as having tightly braided hair that was not sticking out and wearing a gold chain and a dark blue tank top and shorts.

Detective Warren Headrick testified that he arrived at Kivett's home to find the defendant in the back of the ambulance. He reported he had been shot by "Bella." Detective Headrick testified that the defendant was shot with the gun found in the green 4-Runner and that the police believed that the shooting took place on Cedar Church Road at a barn that belonged to a relative of Sudderth.

Officer Ron Talbott testified that in the course of his work with the Drug Task Force in Blount County, he had received reliable information about criminal activity from Kellogg. During

13

one interview in February or March 2000, Talbott recorded the information that Kellogg gave him about the victim's murder and turned it over to Detective Manuel in the Blount County Sheriff's Office. Officer Talbott also learned from Kellogg that there was an unnamed female who knew first-hand information but was too afraid to talk. A few months later, Kellogg told him the female was Ashley James. Officer Talbott testified that he was not aware that Kellogg would testify at the defendant's trial until a few weeks before trial and never offered him any sort of leniency or suggested what he should say if he testified.

On further questioning, Officer Talbott testified that Kellogg had been an informant for about three years. He acknowledged that he sometimes paid Kellogg but stated he did not pay him for information about the murder case. He agreed that he arrested Kellogg on Halloween night in 1998 for drug possession and driving on a revoked licensed and that Kellogg was on probation at the time. He did not know why the charges were later dropped. Officer Talbott was aware that in another murder case Kellogg had testified to bringing over two pounds of cocaine from Atlanta to Blount County, but he stated that no effort had been made to prosecute Kellogg based on that testimony. Shown a report in which he discussed Kellogg's information about the victim's murder with an FBI agent on January 24, 2000, Officer Talbott stated that he didn't recall exactly when the interview with Kellogg had taken place. On further questioning, Officer Talbott noted that the two judgments relating to the Halloween arrests of Kellogg reflected that charges were initially held in abeyance for six months and then dismissed.

Betty Law testified that she was a retired schoolteacher and the next door neighbor of Edna Delapp on Scenic Drive for over thirty years. She stated that after the Delapps and the victim moved in, there was more traffic at the home. She noted that mostly male visitors often came to the house for short periods of time.

The defense rested.

### State's Rebuttal

On rebuttal examination, Detective Manuel stated that he was very good friends with Beverly Black and her family. He stated that about a week before the defendant's trial, he called regarding the arrest of Black's son-in-law, Henderson. During their conversation, Black told him that Kellogg had been to her house and had said "he would do whatever he has to to help himself out in any situation with law enforcement." Detective Manuel stated that nothing specific about the murder case was discussed, and he asked Black no questions about Kellogg.

Following deliberations, the jury returned a verdict finding the defendant guilty of first degree murder.

### Sentencing Phase

Through Mr. Tom Hatcher, Circuit Court Clerk for Blount County, the state

14

introduced a judgment reflecting the defendant's prior conviction for aggravated robbery. Detective Dale Boring testified that he was the prosecuting officer on the case, and the defendant had pleaded guilty as charged. He noted that the robbery indictment identified the defendant as "Anthony Carter, Jr., alias."

Diva Brown testified that the victim was her only child. Before he lived with the Delapps, he lived with her and her husband, but he felt it was time to move out on his own. She stated that after he moved out, she spoke to and saw her son often. She and Edna Delapp discussed their children three or four times a week. Brown described her son as "a sweet loving child, full of fun." She stated he was respectful toward her and was close to his stepfather and other family members. She felt that he was beginning to stray toward dealing in drugs, and this was one reason he decided to leave home. She last saw him on the morning before his murder and told him she would take him to apply for a job. She recalled telling him that she wanted him to get back in school, go to church, move back home, and start over because he would not make it living on the streets. About 2:00 a.m., she received a phone call from Stephanie Delapp telling her that her son had been shot. A few minutes later, Delapp called back and told her "he's gone." Brown stated a friend had called her earlier that day and told her that her son might be involved in the rape of Lynn Porter. Brown did not believe her son would do "something that stupid." She stated after he was killed, she thought all the time that if she had gone and found her son that day, maybe he would still be alive. She stated her life would never be the same and that no one knew how hard it was for her to sleep through the night because she thought about her son constantly. She stated she could not bear to hear other parents talking about their children and felt that she had become mentally unstable because of his death. Brown stated that she wanted to die so she could see her son again.

Elizabeth Faye Dean testified that the victim was her nephew and was always with her own three children. She stated that his death had "about driven [her] crazy," and there was not a day that she did not miss him. She stated that "a part of her heart has been tore out."

The defendant testified in his own defense. He stated that he was born in January 1973 and was twenty-seven years old. He admitted to previous convictions for theft over $10,000, reckless endangerment, and aggravated robbery. As to the latter conviction, he stated he entered a best interest plea. He stated the incident began as a fight, and he was not involved until he jumped in after the other person pulled out a knife. After the fight, the defendant stated he picked up some items from the ground and fled from police, which resulted in the robbery charge.

The defendant stated he grew up with his mother until he turned fourteen, and then he felt it was time to be on his own. He initially lived with a girl friend but later was locked up in various juvenile facilities. He stated that a five-month period was the longest time that he had gone without being locked up since the age of fourteen. He stated that since being held prior to the instant trial, he had obtained his graduate equivalency diploma. He described his mother as his best friend, and because she had been to the trial every day and was under a lot of stress, he had asked her not to come to hear him testify. He stated he had a seven-year old son and wrote to him regularly from prison. He stated that before he was incarcerated, he had custody of his son and tried to support him

15

despite having no job.

On cross-examination, the defendant stated that his name was Arthur Todd Copeland, or "A.C." He stated "Anthony Carter, Jr." was an alias "they came up with" in his aggravated robbery case. He stated he pleaded guilty in that case and admitted that he was the one who caused that victim's injuries. The defendant stated that he drank and smoked marijuana at that time "every day." He agreed that in previous testimony regarding the robbery, he stated that the victim's face was crushed "probably from the kicks or something." The defendant stated that he tried to support his son by "hustling" before he went to prison for the first time. He explained that he could not get a "real job" without an education.

Following deliberations, the jury sentenced the defendant to death for the murder of Andre Jackson. The jury found that the state had proven one aggravating circumstance: the defendant was previously convicted of one or more violent felonies. *See* Tenn. Code Ann. § 39-13-204(I)(2) (2003). The jury further found that the statutory aggravating circumstance outweighed any mitigating circumstances beyond a reasonable doubt.

## I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence, asserting that the state's proof fails to establish beyond a reasonable doubt that he shot and killed the victim or was involved in a complicity to kill him.

When evaluating the sufficiency of the evidence, we must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781 (1979). A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt. On appeal, the defendant has the burden of illustrating why the evidence is not sufficient to support the jury's verdict. *State v. Cole*, 155 S.W.3d 885, 897 (Tenn. 2005); *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). We are required to afford the state the strongest legitimate view of the evidence in the record, as well as all reasonable and legitimate inferences which may be drawn therefrom. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

The defendant was convicted of first degree premeditated murder, defined as a "premeditated and intentional killing of another." *See* Tenn. Code Ann. § 39-13-202(a)(1) (2003). Premeditation is the exercise of reflection and judgment before the doing of an act. *Id.* § 39-13-202(d). Circumstances supporting a finding of premeditation include the use of a deadly weapon upon an unarmed victim, the particular cruelty of a killing, the defendant's threats or declarations of intent to kill, the defendant's procurement of a weapon, any preparations to conceal the crime undertaken before the crime is committed, destruction or secretion of evidence of the killing, and a defendant's calmness after a killing. *State v. Leach*, 148 S.W.3d 42, 53-54 (Tenn. 2004); *Bland*, 958 S.W.2d at 660. A motive for the killing is another factor from which the jury may infer premeditation. *Leach*, 148 S.W.3d at 54; *State v. Nesbit*, 978 S.W.2d 872, 898 (Tenn. 1998).

16

In the light most favorable to the state, the proof showed that on April 6, Stacey Sudderth went to the Howe Street Park and publicly announced to those gathered that he had $10,000 as a "bounty" on the head of the persons responsible for the rape of his girlfriend earlier that afternoon. Tyrone Haley saw the defendant at 9:00 p.m. that evening near the Howe Street Park with the same large gun that he had seen him with earlier in the week. Toure Teeter saw the defendant in front of Jack's Place at around 11:00 p.m. that night. The defendant was "raising a lot of Cain," saying "[y]ou all mother-------- talking about I'm the one that went in Lynn Porter's house. You all got me f----d up. I'm going to go down in history tonight, somebody going to die tonight." Victor Hodge, a witness to Sudderth's angry outburst at the park, stated that Ms. Porter's rape was the main topic of discussion in the community that day. Later that night, Hodge went to Jack's Place, where he saw the defendant and David Brown and spoke with them about "the situation." The defendant asked Hodge for Sudderth's beeper number and told Hodge that he wanted to get in touch with Sudderth because "he had to have that ten thousand."

The jury further heard from Ashley James that Sudderth and Henderson were looking for the victim and Chris Knighton because they believed one of them had committed the rape. James stated Henderson had a gun. Sometime after midnight, she joined Sudderth, Henderson, and the defendant, and the three drove to Maryville to look for the victim's residence. She recalled the defendant was wearing a dark sweatshirt. The defendant directed them to Scenic Drive where they drove down the street until the defendant identified a car belonging to the victim's girlfriend in front of a house. They left and picked up David Brown, who obtained a large gun that he gave to the defendant. The defendant stated that he needed to get the "cheese," or money, to get out of town. Edna Delapp placed the defendant at her home about 2:00 a.m. that morning. Initially, she believed the person pounding on her door was Chris Knighton, who she had briefly met for the first time earlier that day. After staring at him "face-to-face" in the hallway, Delapp realized he was not Knighton. After the victim followed the person out the front door, she had time only to get to her bedroom window before she began hearing gunshots and glass shattering inside the home. Delapp later identified the defendant as the person who came into her home and left with the victim shortly before he was shot. She described him to police as a black male, a little taller than herself, wearing dark clothing, and having his hair styled in "little horns" sticking up around his head. Robyn Rainer testified that the defendant came to her house at about 3:00 a.m. on April 7, and he reported to her and Chris Knighton that the victim was dead and that Knighton needed to leave.

From this proof, a jury could reasonably infer that after proclaiming that he needed the reward money and obtaining a gun, the defendant went to the victim's house, led him outside, and shot him. The defendant focuses on discrepancies in Edna Delapp's identification of the defendant. For instance, at trial, she stated that she had identified the defendant based on his eyes, a factor she did not note in her initial description or earlier testimony. Further, the stipulated height of the defendant was six feet, one inch tall, compared to Delapp's estimation of him as being a little taller than her height of five feet, six inches. Also, Delapp did not see a gun when she observed the defendant. The defendant further points to inconsistencies in the testimony of Myron Kellogg and Ashley James. The jury heard this proof, however, and apparently resolved any issues against the defendant as it was permitted to do. Questions concerning the credibility of the witnesses, the weight to be given the

evidence, and any factual issues raised by the evidence are resolved by the trier of fact. *State v. Davis*, 141 S.W.3d 600, 611 (Tenn. 2004) (citing *Bland*, 958 S.W. 2d at 659); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994).

The defendant further asserts that the evidence was insufficient to convict him for the victim's death under a theory of criminal responsibility. He asserts that there was no evidence showing that he knew the victim was targeted to be killed or that he was involved in a complicity to kill him. The proof does not support the defendant's argument.

A person is criminally responsible for the conduct of another if, "acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2) (2003). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). Under the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred. *See State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime. *See id*.

As recited above, there was sufficient evidence for the jury to conclude that the defendant planned with others to kill the victim for the reward money and/or to avenge the rape of Sudderth's girlfriend. The defendant was aware of the reward money, was angry that some believed he might be the rapist, had proclaimed that someone was going to die that night, procured a weapon, led others to the victim's location, and personally led the victim out of the house very shortly before shots rang out and the victim was fatally shot. Jurors could have logically inferred that the defendant through this conduct was criminally responsible for the victim's death, ultimately leading him outside where Brown and/or Henderson actually shot him.

In summary, the proof was sufficient to sustain the defendant's first degree premeditated murder conviction regardless whether the jury found that the defendant killed the victim or was criminally responsible for his death.

## II. Exclusion of African-Americans from Petit Jury and as Grand Jury Foreman

In his second amended motion for new trial, the defendant argued that the systematic exclusion or under-representation of African-Americans from the petit jury and in the position of grand jury foreman in Blount County violated his right to equal protection of the laws and to a fair trial under the federal and state constitutions.

At a motions hearing on July 30, 2001, Mr. Tom Hatcher testified that he had been Circuit Court Clerk for Blount County since 1994. As part of his duties, he oversaw the jury commission responsible for selecting the juries for trials held in the circuit court. He testified that

18

potential jurors were randomly selected by computer from a database of names compiled by the drivers' license division of the Tennessee Department of Motor Vehicles. Jury commissioners reviewed the list of names to verify addresses and selected jurors. Mr. Hatcher stated that at the time of the defendant's trial, two of the three jury commissioners were Caucasian, and one was African-American. He noted that a list of jurors who actually served on each jury was retained, but not the names of those in an initial pool. No vital statistics such as race, age, or sex, were recorded. Mr. Hatcher testified that grand jurors were chosen in the same manner, and their names were also retained. As to grand jury forepersons, only the names and dates of service were retained.

Defense counsel presented a compilation of information regarding the jurors who actually served in the defendant's case. This report reflected that of the 253 people in the jury pool, 245 were Caucasian, five were African-American, two were Asian, and one was listed as "American." This equated to 96.8 % Caucasian, 1.97 % African-American, and less than one percent Asian. Based on a 1990 Census Bureau Report, counsel noted that the estimated African-American population of Blount County in 1999 was 3.6 percent. Counsel concluded that the information established that African-Americans were under-represented in the jury venire for the defendant's trial and asserted that because of the failure to maintain records of jury venires, he was denied the ability to meet his burden of demonstrating systematic exclusion of African-Americans from serving on petit and grand juries. In overruling the motion for new trial, the trial court found that the evidence established that one African-American had served as the grand jury foreperson before the defendant's trial. The court further found that "there is no information available as to the racial makeup of the [g]rand [j]ury or petit jury, therefore, the issue is without merit."

Before this court, the defendant maintains that the proof established under-representation of African-Americans in the jury venire from which his petit jury was selected as well as in the position of grand jury foreperson over the last twenty years. He cites *Rose v. Mitchell*, 443 U.S. 545, 99 S. Ct. 2993 (1979), in support of his claim for a new trial.

"A criminal defendant 'is entitled to require that the State not deliberately and systematically deny to members of his race the right to participate as jurors in the administration of justice.'" *Id.*, at 551, 99 S. Ct. at 2998 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 628-29 (1972)). In *Rose*, the Court observed that because discrimination in the selection of grand jurors "strikes at the fundamental values of our judicial system and our society as a whole, . . . a criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a racial group purposefully have been excluded." *Rose*, 443 U.S. at 556, 99 S. Ct. at 3000. The Court assumed without deciding "that discrimination with regard to the selection of only the foreman requires that a subsequent conviction be set aside, just as if the discrimination proved had tainted the selection of the entire grand jury venire." *Id.*, at 551 n.4, 99 S. Ct. at 2998 n.4.

This court has observed that a *prima facie* case of discrimination in the selection of grand jury forepersons is met by satisfying a three pronged test as follows:

> The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as

19

written or as applied . . . . Next, the degree of under-representation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as [foreman], over a significant period of time . . . . This method of proof, sometimes called the "rule of exclusion," has been held to be available as a method of proving discrimination in jury selection against a delineated class . . . . Finally . . . a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing.

*State v. Hailey*, 658 S.W.2d 547 (Tenn. Crim. App. 1983), *perm. app. denied* (Tenn. 1983) (quoting *Rose*, 443 U.S. at 565, 99 S. Ct. at 3005).

In the present case, the first prong has been met. As the Court noted in *Rose,* "[t]here is no question, of course, that respondents, as Negroes, are members of a group recognizable as a distinct class capable of being singled out for different treatment under the laws." *Rose,* 443 U.S. at 565-66, 99 S. Ct. at 3005. Our consideration of the proof adduced at the motion hearing, however, does not convince us that the remaining two steps have been satisfied. The testimony of the Blount County Circuit Court Clerk reflected that no African-American had served as foreperson in the seven years since he took office in 1994. The clerk further testified from his personal knowledge and supporting research that an African-American had served as foreman during the 1981-1983 session. As noted, the 1990 census report showed that the estimated percentage of African-Americans residing in Blount County was 3.6. If the total number of years testified to by the Clerk is considered "a significant period of time," the evidence presented reflects that at least one African-American served as foreperson. There was no evidence of how many total forepersons served during the period or what percentage of the total African-American population was in fact eligible to serve as grand jury foreperson during the years considered. Nor was any evidence presented in the form of testimony of any trial judge, court clerk, or former forepersons to shed light upon the process for selecting the foreperson. We cannot conclude that the defendant has proven his claim by establishing that one African-American served as grand jury foreperson during the period in question when the low percentage of African-Americans in the overall population of Blount County is also considered. "Where a disparity may thus be the result of 'chance or accident,' a *prima facie* case has not been proven." *State v. Beal*, 614 S.W.2d 77, 79 (Tenn. Crim. App.), *perm. app. denied* (Tenn. 1981) (quoting *Rose*, 443 U.S. at 571, 574, 99 S. Ct. at 3008, 3009).

The defendant further asserts that there was under-representation of African-Americans on the jury venire from which his petit jury was chosen. A criminal defendant has a constitutional right to a jury drawn from a venire that represents a fair cross-section of the community. "Selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial." *State v. Bell*, 745 S.W.2d 858, 860 (Tenn. 1988) (citing *Taylor v. Louisiana*, 419 U.S. 522, 95 S. Ct. 692 (1975)). Moreover, although a defendant has no right under the Equal Protection Clause to a "'petit jury composed in whole or in part of persons of [the defendant's] own race,' . . . he or she does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria." *Powers v. Ohio*, 499 U.S. 400, 404, 111 S. Ct. 1364, 1367

20

(1991) (quoting *Strauder v. West Virginia*, 100 U.S. 303, 305 (1880)). In this case, the defendant points to the fact that he was ultimately tried by 12 Caucasians. He has failed, however, to establish discriminatory selection of jurors.

Tennessee applies the three-pronged test set forth in *Duren v. Missouri*, 439 U.S. 357, 364, 99 S. Ct. 664, 668 (1979), for determining whether a jury was properly selected from a fair cross-section of the community pursuant to the Sixth and Fourteenth Amendments. *State v. Buck*, 670 S.W.2d 600, 610 (Tenn. 1984). Accordingly, in order to establish a *prima facie* violation of the fair cross-section requirement, the defendant must show:

> (1) that the group alleged to be excluded is a "distinctive" group in the community;
>
> (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and
>
> (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Duren*, 439 U.S. at 364, 99 S. Ct. at 668.

In the present case, the evidence showed that there were five African-Americans in the petit jury pool. The record reveals a slight disparity between the size of the cognizable group in the community and its representation in the jury pool. Had they been included in a number equal to their actual percentage of representation in the community, there would have been nine rather than five African-Americans in the jury pool. Even assuming that the under representation prong is thereby established, however, the defendant has not shown that it was the result of systematic exclusion of African-Americans from the jury pool. Names were selected by jury commissioners from a database created from another database of randomly selected names registered at the State Department of Motor Vehicles. Race and other vital statistics were not requested or recorded in the selection process, and there was no evidence to suggest that the commissioners were otherwise made aware of the race of potential jurors or that they thereby excluded them as members of the venire. Finally, our supreme court observed that there is "no material difference" in selecting jury venires from lists of registered voters versus selecting them from rolls of licensed drivers. *State v. Mann*, 959 S.W.2d 503, 535 (Tenn. 1997). The defendant has failed to establish that his right to be tried by a fair cross-section of the community was violated.

### III. Failure of Indictment to Charge Criminal Responsibility

The defendant asserts that his due process rights were violated through the failure of the indictment to provide him with notice that he was being charged with criminally responsibility for the conduct of others. The one-count indictment charged the defendant with first degree murder. In relevant portion, the indictment specified that the defendant "did unlawfully, intentionally,

deliberately and with premeditation" kill the victim in violation of Tennessee Code Annotated section 39-13-202. The defendant concedes that in *State v. Lemacks*, 996 S.W.2d 166 (Tenn. 1999), the Tennessee Supreme Court decided this issue adversely to his position but argues that *Lemacks* is distinguishable.

The overriding purpose of an indictment is to inform the accused of "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "[A]n indictment is valid if it provides sufficient information (1) to enable the accused to know the accusation to which answer is required; (2) to furnish the trial court an adequate basis for entry of a proper judgment; and (3) to protect the accused from a subsequent prosecution for the same offense." *State v. Carter*, 121 S.W.3d 579, 587 (Tenn. 2003) (citing *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997)).

The indictment in this case named the defendant and informed him that he was charged with first degree murder. More specifically, it charged premeditated murder of the victim on a date certain in violation of the specified statute. Our supreme court has repeatedly held that an indictment need not further allege the specific theory or means by which the State intends to prove each element of an offense. *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000); *Wyatt v. State*, 24 S.W.3d 319 (Tenn. 2000); *Lemacks*, 996 S.W.2d at 172. Thus, "[a]n indictment that charges an accused on the principal offense 'carries with it all the nuances of the offense,' including criminal responsibility." *Lemacks*, 996 S.W.2d at 173. In *Lemacks*, the court expressly held that "to the extent that the State sought to convict the appellee of DUI by way of criminal responsibility, the indictment was constitutionally valid in charging only DUI." *Id.*

We disagree with the defendant's position that *Lemacks* is distinguishable in view of the supreme court's added observation therein that "it was the appellee himself who presented evidence which allowed the State to pursue the theory of criminal responsibility." *Id.* As the court has subsequently noted, the case stands "for the proposition that an indictment which alleges all the elements of an offense will not be held insufficient if it fails to allege the specific theory by which the State intends to prove each element." *Hammonds*, 30 S.W.3d at 301. The indictment against the defendant sufficiently alleged first degree murder, and no more was required.

## IV. Aggravating Circumstance in Indictment under <u>Apprendi</u>

The defendant asserts that the indictment was defective and void because it failed to charge the aggravating factor relied upon by the state to support the sentence of death. He argues that under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), and its progeny, the aggravating factor in this case -- that the defendant had a prior violent felony conviction -- must be included in the indictment. The defendant further asserts that because his prior conviction was not entered until after the murder for which he was sentenced in the present case, the conviction cannot be used to enhance the penalty to death.

Our supreme court has repeatedly rejected the defendant's argument that the state must charge the aggravating circumstances in the indictment, beginning with its decision in *State v. Dellinger*, 79 S.W.3d 458, 466-67 (Tenn. 2002), *cert. denied*, 537 U.S. 1090, 123 S. Ct. 695 (2002). *See also State v. Odom*, 137 S.W.3d 572, 591 (Tenn. 2004); *State v. Holton*, 126 S.W.3d 845, 862-63

22

(Tenn. 2004); *State v. Carter*, 114 S.W.3d 895, 910 n.4 (Tenn. 2003). In so holding, the court in *Dellinger* noted that the prior violent felony conviction aggravator was specifically excluded from the *Apprendi* holding.

In *State v. Berry*, 141 S.W.3d 549, 559 (Tenn. 2004), the court revisited the issue at length and reaffirmed its holding in *Dellinger*. In so doing, the court further concluded that subsequent decisions extending and clarifying the application of *Apprendi* did not alter its holding in *Dellinger* that the state is not required to charge aggravating circumstances in an indictment. *See also State v. Leach*, 148 S.W.3d 42, 59 (Tenn. 2004).

Finally, the defendant contends that his aggravated robbery conviction cannot be used to support the prior violent felony aggravating circumstance because his guilty plea and conviction for the robbery charge were not entered until after the date of the murder in the present case. He asserts that the robbery conviction is thus not properly considered a "prior conviction" for sentencing purposes.

The record reflects that the aggravated robbery offense occurred on May 14, 1996. The defendant entered a guilty plea to the aggravated robbery charge on May 16, 1997, and judgment was entered on June 25, 1998. The victim in the instant case was murdered on April 7, 1998. The defendant's capital sentencing hearing took place in 2000. In sentencing the defendant to death, the jury found that the defendant had a prior conviction for a violent felony offense pursuant to Tennessee Code Annotated section 39-2-203(I)(2). That section requires that the "defendant was previously convicted of one or more felonies, other than the present charge, which involved the use or threat of violence to the person." Tenn. Code Ann. § 39-2-203(I)(2) (2003).

> The language in the statute, 'previously convicted' clearly indicates that the date of the conviction, not of the commission of the crime, is the important factor. The order in which the crimes were actually committed is irrelevant, as long as the convictions have been entered before the sentencing hearing at which they are introduced into evidence.

*State v. Caldwell*, 671 S.W.2d 459, 465 (Tenn. 1984). In the present case, the defendant's conviction for aggravated robbery was entered over two years before his sentencing on his first degree murder conviction. The prior conviction was properly used to establish the (I)(2) aggravating circumstance and to support the sentence of death.

## V. Excited Utterance Testimony

The defendant argues that the trial court erred in permitting Myron Kellogg to testify to statements made to him by Ashley James on the day after the victim's murder as "excited utterances" pursuant to Tennessee Rule of Evidence 803(2).

Before the jury, Kellogg testified that he was with James on April 6 and that she drove

him home before midnight. The following morning, James returned to his house about 11:00, "hysterical, excited," and "upset about something." On being advised that the state intended to question Kellogg concerning the subsequent statements made by James, the court held a jury-out hearing. At the conclusion of the hearing, the court ruled that James's statements to Kellogg made eight to ten hours after the murder and after her arrival at Kellogg's house in a "hysterical" state, qualified as excited utterances. Specifically, the court observed that "if what she said was true, then that certainly would qualify as a startling event, driving around with four people planning a murder and then hearing a gunshot." The court permitted Kellogg to testify to James's statements as to "who she was with initially, what Homer Henderson wanted to know, and what she told him; that the four of them got back together, . . . that she and Mr. Henderson went to Kay's," and that she heard gunshots and then went to Knoxville.

Pursuant to the court's ruling, Kellogg testified before the jury that according to James, she got together with Henderson, Sudderth, Brown, and the defendant after leaving Kellogg's home the night before. Henderson wanted to know where James had dropped off the victim earlier in the week, and James told him the Scenic Drive address. The group drove in two vehicles to Maryville. Somewhere near the victim's home, the defendant got out of the car with James and Henderson, talked with Sudderth and Brown and then got into their car. James stated that she and Henderson then went to the Kay's Ice Cream "around the corner" and while there, James heard gunshots. She told Kellogg she had seen guns before she and Henderson had separated from the other three men.

James later testified at trial. Although she testified to driving to Maryville with Sudderth, Brown, Henderson, and the defendant after leaving Kellogg on the night of April 6, she denied that her purpose in going with the men was to provide them with directions to the victim's house. She agreed that Henderson had asked her if she knew where the victim lived, but she told him that she did not. James stated that the defendant said he knew where the victim lived because he had been there before to have speakers installed in his car and that it was the defendant who spotted the car belonging to the victim's girlfriend in a driveway on Scenic Drive. James denied going to Kay's Ice Cream with Henderson after they split up from the others or hearing any gunshots fired. Instead, she testified that after leaving the other three men, she and Henderson drove to a motel in Knoxville and checked in before midnight. She testified that she was "distresssed, disgusted, and upset" the next morning on learning that the victim had been killed and was "still upset" when she went to Kellogg's house and told him what had happened the night before.

The defendant argues first that James's statements do not qualify as excited utterances, particularly in view of her subsequent inconsistent testimony. The defendant further asserts that the state misled the trial court in arguing that James's statements were "excited utterances" in view of her testimony that she told prosecutors a month before trial that she was at a motel in Knoxville at the time of the murder and could not have been at Kay's Ice Cream and heard gunshots.

Pursuant to Rule 803 of the Tennessee Rules of Evidence, an "excited utterance" is an exception to the general rule excluding hearsay evidence. Tenn. R. Evid. 803(2). In order for a statement to be admissible under this exception, (1) there must be a startling event or condition, (2)

24

the statement must relate to the startling event or condition, and (3) the statement must be made while the declarant is under the stress or excitement from the event or condition. *Dellinger*, 79 S.W.3d at 486 (citing *State v. Gordon*, 952 S.W.2d 817, 820 (Tenn. 1997)).

In the present case, the trial court admitted James's statements as excited utterances based on the context and nature of the statements as testified to by Kellogg during the jury-out hearing on the matter. Based on Kellogg's testimony, the court properly found that the gunshots that James heard nearby shortly after parting company with her three acquaintances and knowing that they had guns and were planning a murder qualified as a startling event. In addition, evidence that James was "hysterical" when she arrived at Kellogg's home the next day and recounted the previous night's events supports a finding that her statements related to the startling event and were made while she was under the stress of the event.[1] Thus, the trial court properly admitted the statements under Rule 803(2). Although portions of James's later testimony contradicted her account of the events as testified to by Kellogg, any inconsistency goes to the issue of the credibility of James and Kellogg, both of whom were extensively cross-examined by the defense. The trial court's decision to admit the excited utterance when that issue was presented during Kellogg's testimony cannot be impugned by testimony of the hearsay declarant that was not presented until later.

## VI. Proposed Expert Testimony on Eyewitness Identification and Special Jury Instruction on Eyewitness Identification

As noted, the evidence against the defendant was entirely circumstantial. The testimony of Edna Delapp, a Caucasian woman, was critical in that it placed the defendant, an African- American male, at the scene of the murder immediately before the victim was killed. The defendant sought to call Professor John Brigham to testify as an expert in the area of cross-racial eye-witness identification. He faults the trial court in refusing to permit the expert to testify at trial and, in a related issue, in denying a special jury instruction based on the expert's proffered testimony.[2] We consider both issues here.

### (a). Expert testimony

In his proffered testimony, Dr. Brigham testified that some factors influencing eyewitness identifications are not within the common knowledge of the average citizen. He noted studies showing that there is a lack of a relationship between a person's confidence or certainty in an identification and its accuracy. Dr. Brigham generally testified to the process of making an identification through the three stages of memory and the effect of reinforcement on an identification.

---

[1] Based on James's trial testimony, the startling event which actually caused her to become hysterical was learning the next morning that the victim had actually been killed. James said that she was "still upset" when she spoke with Kellogg several hours later. As noted, the trial court did not hear this testimony until after ruling as set forth above.

[2] This latter issue was presented by the defendant as his issue number XXI.

25

He noted studies reflecting a large percentage of misidentifications in cases in which eyewitness identification was the predominant source of evidence. Dr. Brigham opined that his testimony explaining the factors relevant to consideration of eyewitness identifications would give the jurors a "frame of reference with which to weigh eyewitness identification to decide how much weight to give it in comparison to other types of evidence." On questioning by the court, defense counsel stated they intended to ask Dr. Brigham "general questions that are not specifically about the factors in this case" and about cross-racial identification through a hypothetical question "about white people identifying black people." Finding that settled case law did not permit such testimony, the trial court declined to permit Dr. Brigham's testimony.

On appeal, the defendant concedes that since his trial, the Tennessee Supreme Court has held that expert testimony concerning eyewitness identification does not substantially assist the trier of fact under Tennessee Rule of Evidence 702 and is therefore *per se* inadmissible. *See State v. Coley*, 32 S.W.3d 831, 838 (Tenn. 2000). The defendant nonetheless avers that it was reversible error to exclude the expert testimony in his case. He asserts that "there are very important scientific factors affecting the reliability of cross-racial eyewitness identifications that can substantially assist the jury."

The admissibility of expert testimony is within the broad discretion of the trial court. Its ruling will not be overturned on appeal absent an abuse of such discretion. *See State v. Stevens*, 78 S.W.3d 817, 832 (Tenn. 2002), *cert. denied*, 537 U.S. 115, 123 S. Ct. 873 (2003); *Coley*, 32 S.W.3d at 833.

The court in *Coley* explained the basis for its finding that a *per se* rule excluding such expert testimony was appropriate. The court stated:

> [W]e find that expert testimony concerning eyewitness identification simply offers generalities and is not specific to the witness whose testimony is in question. Moreover, we are of the opinion that the subject of the reliability of eyewitness identification is within the common understanding of reasonable persons. Therefore, such expert testimony is unnecessary. It may mislead and confuse, and it could encourage the jury to abandon its responsibility as fact-finder. Such responsibility is a task reserved for and ably performed by the jury, aided by skillful cross-examination and the jury instruction promulgated in [*State v. Dyle*, 899 S.W.2d 607 (Tenn. 1995)] when appropriate. For these reasons, we find that general and unparticularized expert testimony concerning the reliability of eyewitness testimony, which is not specific to the witness whose testimony is in question, does not substantially assist the trier of fact.

*Coley*, 32 S.W.3d at 837-38.

26

We are unpersuaded by the defendant's attempt to distinguish *Coley* from the instant case. As in *Coley*, the proposed expert testimony herein was on the subject of eyewitness identification in general and was not specific to the identification of the defendant by Edna Delapp. Further, although the defendant in his brief emphasizes "the undeniable scientific nature and complexity of the 'own-race effect' in cross-racial eyewitness identifications," we observe that cross-racial identification in particular was never mentioned in the witness's proffer. The trial court did not err in ruling the proffered testimony inadmissible.

### (b). Jury Instruction

The defendant requested a jury instruction on eyewitness identification that excluded language contained in the pattern jury instruction regarding an eyewitness's "certainty" of an identification. The trial court denied the request and charged the jury in accordance with the pattern instruction on eyewitness identification approved in *Dyle*. In relevant part, the pattern instruction informed jurors that among the factors they may consider in determining the value of identification testimony is "the degree of certainty expressed by the witness regarding identification. "

As noted, the trial court properly excluded the proffered expert testimony because it is *per se* inadmissible. Accordingly, the trial court properly denied the request for a special jury instruction based on the same excluded testimony.

## VII.  Defendant's Right to Testify at Trial

Although acknowledging that this issue was not raised at trial or in his motion for new trial, the defendant asserts that the trial court's failure to assure that the defendant in fact waived his right to testify in his own defense constitutes plain error. The defendant seeks remand of his case to the trial court for a hearing to determine whether the alleged violation of the defendant's right to testify was harmless error.

Before this court may address the merits of the issue, we must determine whether it is one of plain error -- an error which affects a substantial right of the accused and that may be noticed at any time. *See* Tenn. R. Crim. P. 52(b). In *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this court set forth the following factors for deciding whether an issue constitutes plain error:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*Id*. at 641-42.

As our supreme court observed in *Momon v. State*, 18 S.W.3d 152, 157 (Tenn. 1999), it is well-settled that the right of a criminal defendant to testify in his own defense is a fundamental right guaranteed under the state and federal constitutions. Because the right is fundamental, it may only be personally waived by the defendant. *Id*. at 161. "[T]he waiver of a fundamental right will not be presumed from a silent record, and the courts should indulge every reasonable presumption against the waiver of a fundamental right." *Id*. at 162. In *Momon*, the court mandated that henceforth, in all trials, the trial court must hold a jury-out hearing during which the defendant's counsel shall voir dire the defendant to determine that the defendant's knowing, voluntary, and intelligent waiver of his right to testify is preserved on the record. *Id*. Here, the record does not reflect that an inquiry regarding the defendant's right to testify was conducted. We therefore conclude that the trial court erred in failing to require defense counsel to conduct an inquiry into the defendant's right to testify under the *Momon* guidelines.[3]

In concluding that the failure to follow the guidelines of *Momon* constitutes plain error, we reject the state's position that the defendant waived his right to testify for a tactical reason. The record reflects that after the completion of testimony by defense witnesses, the defense sought to introduce various criminal records of several state's witnesses in an effort to establish their bias, and the state objected. Still in the presence of the jury, the court first inquired of the defense whether it had "any other live witnesses," to which defense counsel responded it did not. The court ordered a jury-out hearing and ruled regarding the challenged records. After a lunch recess, proceedings continued outside the jury's presence. Defense counsel stated:

> I think . . . we have arrived at the time for the Court to rule on the
> State's motion -- notice that they gave us to impeach Mr. Copeland
> with prior convictions. And I believe they also filed one regarding
> prior bad acts. We would ask for the ruling on that at this time.

The trial court ruled that defendant's prior convictions for aggravated robbery, theft over $10,000, and felony reckless endangerment would be admissible if he took the stand, although evidence of a pending weapons charge would be inadmissible. Following the ruling, the jury returned and the defendant rested its case. The state contends that under this factual background, the record supports a determination that the defendant made a tactical decision not to testify after learning that his prior convictions could be used against him if he did take the stand. Under *Momon*, however, the defendant must be examined to ensure, at a minimum, that he "has consulted with his or her counsel in making the decision whether or not to testify; that the defendant has been advised of the advantages and disadvantages of testifying; and that the defendant has voluntarily and personally

---

[3]The defendant's trial began on July 10, 2000. The *Momon* opinion had been filed approximately eight months earlier, on November 15, 1999.

waived the right to testify." *Id.* In our view, the fact that the defendant was informed that his three prior convictions would be admissible against him if he testified is not sufficient, without more, to show that he personally made a strategic decision to waive his right to testify based on the court's ruling. Again, we may not presume a waiver of a fundamental, constitutional right from a silent record.

In *State v. Posey*, 99 S.W.3d 141 (Tenn. Crim. App. 2002), this court considered the defendant's identical claim that the trial court erred in failing to comply with the *Momon* guidelines. Noting that the record gave "no indication of what the substance of the Defendant's testimony would have been had he testified," did not reflect "whether the Defendant desired to testify," and did not reflect "that the Defendant personally waived his right to testify," this court concluded that it was without sufficient information to conduct a harmless error analysis of the asserted constitutional violation. *Id.* at 149. The court thus remanded the case for a determination whether the defendant wished to exercise his right to testify on his own behalf. *Id.* The court further observed:

> If he did, then a hearing must be held at which the State will bear the burden of establishing that the denial of the Defendant's right to testify on his own behalf was harmless beyond a reasonable doubt. If the trial court concludes that the State has met its burden, the Defendant's conviction will be sustained. However, if the State fails to prove that the error was harmless beyond a reasonable doubt, the trial court must vacate the Defendant's conviction and grant the Defendant a new trial.

*Id.*

Because a fundamental right of the defendant is involved, the failure to follow the procedure in *Momon* is an error that requires a remand pursuant to *Posey*. We hold that, to the extent that a remand for determining harmlessness of the error is necessary, the error should be noticed as plain on the record. On remand, the following factors are relevant to a determination of whether the denial of the right to testify is harmless beyond a reasonable doubt: (1) the importance of the defendant's testimony to the defense case; (2) the cumulative nature of the testimony; (3) the presence or absence of evidence corroborating or contradicting the defendant on material points; and (4) the overall strength of the prosecution's case. *Momon*, 18 S.W.3d at 168. The cited factors are "merely instructive and not exclusive considerations." *Id.*; *see also Posey*, 99 S.W.3d at 149.

As discussed herein, this case must be remanded for an initial determination pursuant to *Momon* whether the defendant desired to exercise his right to testify in his own defense at trial and, if necessary, for a harmless error hearing, in which the burden of showing harmlessness would rest upon the state. *James C. Breer v. State*, No. W2004-01017-CCA-R3-PC (Tenn. Crim. App., Jackson, May 20, 2005).

## VIII.  Leg Restraints

The defendant contends that being forced to wear a leg restraint during jury selection and throughout his trial with no judicial determination of the necessity for the restraint violated his due process rights to a fair trial.  The state asserts that because the restraint was not visible, the fact that it slightly affected his gait, without more, is insufficient to establish a due process violation.

In a pretrial motion, the defendant requested that the members of the jury pool who witnessed him walk before them at the beginning of the jury selection process be excused and that he not be required to wear a leg restraint at any time when he appeared before potential or actual jurors throughout the remainder of the trial.  The court held a hearing on the matter during jury selection.  The defendant testified that his left leg was restrained by a Velcro strap attached to a metal rod that went down the side of his leg under his clothing.  It was locked at the bottom of his leg.  He claimed that the restraint was visible under his pants, as if he had "a cast or something on."  He stated that the restraint made him limp, that it was generally uncomfortable, and that it caused him to make smaller steps in an effort to avoid a "clicking sound" when he stretched his leg.  The court found that the defense table was purposely situated not more than 5 to 10 feet from the door "so [the defendant] wouldn't have to walk very far, because his gait -- the way he walks is affected some," but that this was not something that "anybody would notice when everybody that's walking in was walking slowly to begin with."

Following argument, the court ruled that neither case law nor due process principles required a hearing regarding the wearing of restraints that were not visible to the jury or the public.  The court declined to discharge the jury pool or to relieve the defendant from continuing to wear the restraint.

Later during jury selection proceedings, defense counsel again brought up the subject of the leg restraint, claiming that from the end seats in the jury box, the defendant's legs could be viewed under the defense table.  Counsel claimed that the brown, metal end of the restraint was visible when the defendant's pants rode up.  The discussion ended with the parties and the court briefly discussing whether there were "skirts" available to place around the attorneys' tables in court, but the record does not reflect that any such measure was taken.  There is no dispute that the defendant continued to wear the leg restraint throughout the trial.

The concept of due process imbedded in our state and federal constitutions guarantees every criminal defendant a fair and impartial trial.  Included in the presumption of innocence is the defendant's right to the "physical indicia of innocence."  *Willocks v. State*, 546 S.W.2d 819, 820 (Tenn. Crim. App. 1976) (citing *Kennedy v. Cardwell*, 487 F.2d 101, 104 (6th Cir. 1973), *cert. denied sub nom. Kennedy v. Gray*, 416 U.S. 959, 94 S. Ct. 1976 (1974)).  The rule that a prisoner brought into court for trial is entitled to appear free from all bonds or shackles is an important component of a fair and impartial trial, and shackles should never be permitted except to prevent the escape of the accused, to protect everyone in the courtroom, and to maintain order during trial.  *Kennedy*, 487 F.2d at 105 (citing *Woodards v. Cardwell*, 430 F.2d 978, 982 (6th Cir. 1970)).

30

In holding that in-court shackling is inherently prejudicial, this court has agreed that "there should be a legal presumption against the necessity of in-court restraint, with the burden falling on the state 'to show the necessity of any extreme physical measures.'" *Willocks*, 546 S.W.2d at 821 (quoting *Kennedy*, 487 F.2d at 107). In the present case, there was no showing at the outset that it was necessary to restrain the defendant. We nonetheless conclude that the defendant has failed to show an abuse of discretion in the trial court's failure to reach the issue because the defendant has not demonstrated that the type of leg restraint in this case falls within the same category as the obvious shackles, manacles, and gags found objectionable in *Willocks* and the cases cited therein. Other than the trial court's finding that the restraint worn under his clothing affected the defendant's gait in that it caused him to walk more slowly, the record before us is devoid of any proof that the restraint was in fact visible to jurors or that they were aware that he was restrained at all.

> Generally, the trial court, which has presided over the proceedings, is in the best position to make determinations regarding how to achieve [the] primary purpose [of ensuring a fair trial], and absent some abuse of the trial court's discretion in marshalling the trial, an appellate court should not redetermine in retrospect and on a cold record how the case should have been better tried.

*State v. Franklin*, 714 S.W.2d 252, 258 (Tenn. 1986).

Finally, the defendant has submitted supplemental authorities in support of his argument, including the recent decision of the United States Supreme Court in *Deck v. Missouri*, __ U.S. __, 125 S. Ct. 2007 (2005). Therein, the capital defendant at his resentencing hearing was shackled with leg irons, handcuffs, and a belly chain visible to the jury over the defense's strenuous objections. The jury sentenced the defendant to death for the second time. The Court began by noting that the "law has long forbidden routine use of visible shackles during the guilt phase" of a criminal trial, permitting them "only in the presence of a special need." *Id*. at __, 125 S. Ct. at 2010. Observing that the jury's decision during the penalty phase is equally as important as its determination of the defendant's guilt, the Court held that "courts cannot routinely place defendants in shackles or other physical restraints visible to the jury during the penalty phase of a capital proceeding." *Id*. at __, 125 S. Ct. at 2014. The Court reversed and remanded the case for further proceedings. Returning to the instant case, we observe that the significant factor distinguishing *Deck* is the lack of a showing from the record before us that the leg restraint worn by the defendant throughout his trial was in fact at any point *visible* to the jury. Absent such a showing, the defendant cannot prevail on this issue.

Upon our review of the record, the defendant has failed to establish that the trial court abused its discretion in ordering that he wear a concealed leg restraint at trial.

### IX. Motion for Continuance

The defendant avers that the trial court erred in refusing to grant his motion for a continuance based on his assertion that the state failed to disclose a number of its witnesses until less

31

than thirty days before trial was set to begin. In addition, the defendant points to the fact that only a week before the trial, the state also indicted Mr. Sudderth, Mr. Henderson, and Mr. Brown for murder and conspiracy in the victim's death.

After several earlier continuances, jury selection was set to begin on July 10, 2000. Before that time, on July 5, the defense moved to strike all witnesses provided by the state in an untimely manner. The court heard argument on July 7. The defendant asserted that between June 2 and July 5, the state first began issuing subpoenas and providing to the defense lists of witnesses. While acknowledging that the defense was already aware of some of these witnesses, it claimed many were a complete surprise and left the defense without time to investigate or interview them. The defense asserted that its preparations were further complicated when on June 30, the state indicted three other persons, Mr. Sudderth, Mr. Henderson, and Mr. Brown, for murder and conspiracy in the victim's death. In response, the state asserted that many witnesses in the case were reluctant to come forward, and it had provided lists of their names and addresses to the defense as that information was received. The court denied a continuance, finding that the state had done what was required of it and sometimes more, that the state could choose to continue its investigations and pursue leads at the eleventh hour, and that the parties had had nearly two years to prepare their cases.

> [I]t has always been the rule in this State that a trial judge will not be put in error for denying a continuance unless it is shown that he has abused his discretion in doing so, because the granting or denying of a continuance is a matter which addresses itself to the sound discretion of the trial judge.

*Moorehead v. State*, 409 S.W.2d 357, 358 (Tenn. 1966) (citing *Bass v. State*, 191 Tenn. 259, 231 S.W.2d 707 (1950)). An abuse of discretion is demonstrated by showing that the failure to grant a continuance denied the defendant a fair trial or that it could be reasonably concluded that a different result would have followed had the continuance been granted. *State v. Hines*, 919 S.W.2d 573, 579 (Tenn. 1995) (citing *State v. Wooden*, 658 S.W.2d 553, 558 (Tenn. Crim. App. 1983)). "The burden rests upon the party seeking the continuance to show how the court's action was prejudicial. The only test is whether the defendant has been deprived of his rights and an injustice done." *State v. Goodman*, 643 S.W.2d 375, 378 (Tenn. Crim. App. 1982) (citing *Baxter v. State*, 503 S.W.2d 226, 228 (Tenn. Crim. App. 1973)). In the context of an alleged late disclosure of witnesses, "it is not the prejudice which resulted from the witnesses' testimony but the prejudice which resulted from the defendant's lack of notice which is relevant to establish prejudice." *State v. Kendricks*, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996) (citing *State v. Jesse Eugene Harris*, No. 88-188-III (Tenn. Crim. App, Nashville, June 7, 1989)).

In this case, the defendant offers nothing to support his conclusion that the denial of a continuance in this cause "clearly was prejudicial to the defense." The defendant complains, for example, that the "most devastating" witnesses against him, Myron Kellogg, Ashley James, and Tyrone Haley, were first disclosed about 10 days before trial, but he does not show whether or how this notice affected his trial preparations. The record reflects that James met with the defense on July

32

6 and refused to discuss the case with them. On cross-examination, Kellogg acknowledged that he knew an effort was being made to serve him with a subpoena and that defense counsel wanted to speak with him a few weeks before trial, but he stated that he had "been busy." Similarly, Haley acknowledged that he had agreed to talk with the state but not the defense because the state was working on behalf of his friend, the victim. The record further reflects that counsel extensively cross-examined each of these witnesses and vigorously attempted to impeach them. In short, with respect to these and any other challenged witnesses, "the defendant has failed to show what more he could or would have done had he known about [the witnesses] earlier." *Kendricks*, 947 S.W.2d at 883.

## X. Photographic Lineup

The defendant contends that the trial court erred in failing to suppress the photographic lineup identification of the defendant by state's witness Edna Delapp. He asserts that the method used to conduct the photographic lineup was so impermissibly suggestive that it gave rise to a substantial likelihood of misidentification in violation of his due process rights.

At a hearing on the defendant's motion to suppress, Detective Manuel testified that he transported Edna Delapp and her daughter to the police station to interview them between 2:00 a.m. and 3:00 a.m., just after the murder. According to Detective Manuel, Delapp described the man who came into her home as a "black male, five-ten, five-eleven, wild-looking hair," "tall, with ponytails of hair sticking up,"and wearing a dark-colored coat. She did not note any other distinctive characteristics such as scars or facial hair. Detective Manuel explained that during the hours after the murder, investigators "developed" the defendant as a possible suspect. Detective Manuel contacted the Blount County Sheriff's Department and requested that they create a photographic array including a photograph of the defendant and people similar in appearance to him. Delapp returned to the police station and was shown a black and white copy of the color-photographic array prepared by the sheriff's department. Detective Manuel estimated that within five minutes, Delapp identified the defendant as the man she had seen in her home. He testified that the witness was always told that the person he or she had observed may or may not appear in an array, and that one should not identify anyone if one were not sure. He stated that no one was suggested to Delapp as being the suspect. He further stated that he was certain that he told Delapp after she identified the defendant that he was in fact the person that police considered a suspect in the victim's murder. Detective Manuel further testified that he did not recall whether Stephanie Delapp was with her mother during the photographic line-up. He recalled that at that time, Edna Delapp had received treatment for her eye injury and did not appear to be in any obvious pain or under the influence of any kind of medication or drugs.

The court further heard from Edna Delapp that she recognized the defendant from the photographic array and that she had no doubt whatsoever that he was the person who knocked on her door and came into her house earlier that morning. She noted that she initially observed the person from about one foot away when she answered the door, and then she got a better look at him in the hallway as they stood face-to-face when he and the victim came up the stairs to exit the house. Delapp noted that she had also met Mr. Knighton the day before and believed that his photograph "possibly" appeared in the array she viewed. In denying the motion to suppress, the trial court found

33

that the procedure utilized by Detective Manuel was not suggestive and ruled that both the out-of-court and in-court identifications of the defendant were thus admissible.

"[C]onvictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968). Following *Simmons*, the Court in *Neil v. Biggers*, 409 U.S. 188, 198-99, 93 S. Ct. 375, 381-82 (1972), established a two-part analysis to assess the validity of a pre-trial identification. First, the trial court must determine whether the identification procedure was unduly suggestive. *Id*. at 198, 93 S. Ct. at 381-82. Next, if the trial court determines that the identification was unduly suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable. *Id.* at 198-99, 93 S. Ct. at 382.

Applying the first prong of the test, we conclude that the record supports the trial court's finding that the identification procedure was not suggestive. There was nothing improper in the photographic array itself. The black and white array included photographs uniform in size of six young African American males with similar, braided hairstyles. Except for one person, all, including the defendant, wore dark-colored tee shirts. Moreover, the witness observed the defendant as he entered and left her home that morning and once stood face-to-face with him. She was able to provide a description to police within two hours of the victim's murder. There was nothing to indicate that anyone suggested the defendant to her as the suspect. She stated that she did not recognize anyone pictured other than the defendant and "possibly" Chris Knighton. She stated she took several minutes to view the photographs to be sure she did not make a mistake and had no doubt of her identification of the defendant as the person she saw shortly before the victim's murder. In view of our conclusion that there was nothing suggestive about the procedure by which the witness identified the defendant, we need not reach the question of whether the identification was "nonetheless reliable" under the second prong of the *Biggers* test.

## XI. Informing Jurors of Indictment of Others

During voir dire, the trial court informed prospective jurors of the fact that Stacey Sudderth, Homer Henderson, and David Brown had also been recently charged in the victim's murder. The nature of the court's similar remarks to each group of prospective jurors was as follows:

> The indictment charges that on the 7th of April, 1998, here in Blount County, at 1614 Scenic Drive in Maryville, which is out in West Maryville, Mr. Copeland premeditatedly killed Mr. Robert Andre Jackson. Now, there have also been, in the paper of late, some articles about new indictments charging Mr. Stacey Sudderth and Mr. Homer Henderson and Mr. David Bella Brown with conspiracy to murder and murder of this same Mr. Jackson. And I understand that some of the newspaper articles have had some information about this charge

34

against Mr. Copeland, all of it intermingled in the paper. And the reason I'm mentioning that, not because those cases are going to be tried today, but to see if you read any of those articles or have heard any talk about these cases, know anything about it at all.

The defendant contends that by informing jurors that others had been indicted for conspiracy in the victim's murder, the trial court deprived him of one of his indicia of innocence. The defendant suggests that the trial court could have instead accomplished its intended purpose by simply asking the jurors whether they knew or knew of Mr. Sudderth, Mr. Henderson, or Mr. Brown. As the state notes, the defendant makes no effort to explain how he was prejudiced by the trial court's remarks from which jurors could reasonably infer that others may have been involved in or responsible for the victim's death.

Our supreme court has noted that "although questions regarding the content of any publicity to which jurors have been exposed may be helpful in assessing whether a juror is impartial. However, such questions are not constitutionally required, and a trial court's failure to ask such questions is not reversible error, unless the defendant's trial is thereby rendered fundamentally unfair." *Cazes*, 875 S.W.2d at 262. In our view, the reverse is also true; that is, that the trial court was not prohibited from inquiring whether prospective jurors were aware through pre-trial newspaper articles that others had been indicted in the victim's murder in an effort to assess their impartiality. "The ultimate goal of voir dire is to see that jurors are competent, unbiased, and impartial, and the decision of how to conduct voir dire of prospective jurors rests within the sound discretion of the trial court." *State v. Howell*, 868 S.W.2d 238, 247 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 65 (Tenn. 1992); *State v. Simon*, 635 S.W.2d 498, 508 (Tenn. 1982). The trial court's actions will not be disturbed unless clear abuse of discretion is shown." *Harris*, 839 S.W.2d at 65. In the present case, the record reflects no abuse of discretion in the trial court's voir dire of prospective jurors.

## XII. Change of Venue

The defendant submits that the trial court abused its discretion in denying his motion for change of venue in light of evidence that one-third of the sixty-five prospective jurors, four of whom actually served on the jury, indicated during voir dire that they had been exposed to pretrial publicity about the case or personally knew one or more witnesses or other persons associated with the trial. The defendant further noted that at the defendant's preliminary hearing, "a number of individuals . . . showed up wearing sympathetic T-shirts with photographs of Mr. Jackson." The trial court overruled the motion after first taking it under advisement "to see if any problems develop in selecting the jury" with respect to any pretrial publicity.

The trial court has the discretion to determine whether to grant a change of venue. Its decision will be reversed only for a clear abuse of discretion. *State v. Davidson*, 121 S.W.3d 600, 611-12 (Tenn. 2003) (citing *Dellinger*, 79 S.W.3d at 481). "Moreover, before a conviction will be reversed for the trial court's failure to grant a change of venue, an accused must establish 'that the jurors who actually sat were biased and/or prejudiced.'" *Id*. at 612 (quoting *Dellinger*, 79 S.W.3d at

481); *see also State v. Mann*, 959 S.W.2d 503, 532 (Tenn. 1997); *State v. Melson*, 638 S.W.2d 342, 361 (Tenn. 1982).

As the defendant suggests, the record reflects that numerous prospective jurors noted during voir dire that they were exposed to pre-trial publicity or knew someone associated with the defendant's case. However, "[t]he mere exposure of jurors to newspaper publicity is not constitutional error." *Lackey v. State*, 578 S.W.2d 101, 103 (Tenn. Crim. App. 1978) (citing *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031 (1975)). "One who is reasonably suspected of a serious crime cannot expect to remain anonymous." *Id.* (citing *Dobbert v. Florida*, 432 U.S. 282, 97 S. Ct. 2290 (1977)). Without more, the defendant has failed to meet his burden of establishing actual bias or prejudice of any of the jurors who actually heard his case. Based on our own examination of the voir dire of the four jurors specifically referenced by the defendant, we conclude that the record fails to establish any such bias or prejudice. Regarding the questioning of Jurors Price, Lindsey, Arendt, and Webb, the record reflects that only Juror Price recalled hearing about the case and further noted that a friend of his was a possible witness. The other three jurors could recall nothing concerning the defendant's case in articles regarding pending trials. Further, as the state correctly notes, the defendant neither questioned these jurors concerning pretrial publicity nor challenged them for cause. The defendant has shown no abuse of discretion in the trial court's failure to order a change of venue.

### XIII. Testimony Regarding Lighting Conditions at Crime Scene

The defendant asserts that it was error to allow Maryville Police Lieutenant David Graves to testify regarding the lighting conditions at the Delapp home based on his observations from a visit to the home two years after the murder. The defendant asserts the testimony was irrelevant and prejudicial in that it served only to bolster the eyewitness identification of the defendant by Edna Delapp.

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Tenn. R. Evid 402. Questions regarding the relevancy of evidence are entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion. *State v. Robinson*, 146 S.W.3d 469, 490 (Tenn. 2004).

At trial, Lieutenant Graves testified that one morning in July 2002, before the trial began, he went to the Delapp home at about 2:00 a.m. His purpose was "to see whether or not you could see well enough to identify a person from the small watt bulbs that she kept inside her home." He stated he had Edna Delapp "turn on the lights to where they were in the past," noted that the light bulbs were all 25-watts, and then observed Detective Manuel from varying distances.

During a jury-out hearing, Lieutenant Graves further testified that he stood in the

hallway where there was one light at the head of the stairs because this was the location where Ms. Delapp had reported that she had best observed the defendant. He testified that he was "surprised" to find that he had "no problems identifying [Detective Manuel] and seeing features." Following objections by the defense and argument by counsel, the court ruled that "proof about the general amount of light in an area where a critical identification has been made is clearly probative." The court permitted Lieutenant Graves to testify to the lighting conditions in the home and what he was able to see but disallowed questions as to whether Ms. Delapp could have identified someone under those conditions.

Based on our review of the record, we cannot conclude that the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997) (defining a standard for abuse of discretion in admitting evidence). Prior to the testimony of Lieutenant Graves, the defendant cross-examined Ms. Delapp regarding the lighting conditions under which she observed the person whom she later identified as the defendant. The trial court concluded that Lieutenant Graves's testimony about the general lighting conditions in the home and visibility under those conditions was probative regarding Ms. Delapp's identification of the defendant. On cross-examination, the defense elicited testimony from Lieutenant Graves that he had good vision, had worked with Detective Manuel, his subject during the lighting "experiment," and had seen him on an almost daily basis for the previous sixteen years. As the trial court correctly observed, the jury could properly determine what weight, if any, to give the challenged testimony. No abuse of discretion has been shown on appeal.

## XIV. Improper Closing Argument at Trial

The defendant challenges portions of the prosecution's closing argument during the guilt phase as improper and prejudicial in violation of his constitutional rights to due process and a fair trial. He asserts that at various stages in their argument, prosecutors improperly vouched for the credibility of witnesses, denigrated defense counsel, misstated evidence, implied that defense counsel were attempting to mislead the jury, improperly argued in favor of a guilty verdict based on general deterrence, and argued facts not in evidence.

As the state correctly observes, the defendant failed to offer any objection to the challenged portions of the argument at trial. The failure to make a contemporaneous objection constitutes a waiver of the issue on appeal. Appellate relief is generally not available when a party has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error." Tenn. R. App. P. 36(a); *State v. Leonard Dale Kincer*, No. M2004-01403-CCA-R3-CD, slip op. at 19 (Tenn. Crim. App., Nashville, May 11, 2005); *see State v. Sims,* 45 S.W.3d 1, 16 (Tenn. 2001); *Carruthers*, 35 S.W.3d at 580.

## XV. Improper Closing Argument at Sentencing

The defendant avers that prosecutors improperly invited jurors to impose a sentence

37

of death based on factors other than the aggravating and mitigating circumstances established by the evidence.  Again, the state correctly contends that the defendant has waived this issue by his failure to contemporaneously object to the prosecutor's statements during closing argument.  *See* Tenn. R. App. P. 36(a).

### XVI.  Prosecutorial Misconduct as to Witness's Assertion of Fifth Amendment Privilege

The defendant alleges that the prosecutor prevented the defendant from impeaching witness Myron Kellogg in violation of the defendant's right of confrontation by advising the witness of his right against self-incrimination only after the state had completed its direct examination.

After the state's direct examination of Mr. Kellogg and a recess, the following discussion occurred:

Mr. Bailey [Prosecutor]:  Your Honor, may we approach?

Mr. Reed [Defense Counsel]:  Your Honor, could we ask the witness to step out.  I don't want the witness to hear what he tells me.

The Court:  What were you wanting to approach about?

Mr. Bailey:  I was wanting to ask the Court --

Mr. Reed:  Well, Your Honor, I don't want the witness to hear what he's going to --

The Court:  Wait, wait, wait.

Mr. Reed:  The witness is going to hear it –

The Court:  Be quiet.  What is the subject of what you want to talk about without telling me what you want to say about it?

Mr. Bailey:  Fifth Amendment.

The Court:  Okay.  And you don't want him to hear any talk about that?

Mr. Reed:  I don't.  Too late.

Following this exchange, the trial court declined to administer a Fifth Amendment-based admonition to the witness.  The defense vigorously and thoroughly cross-examined him.  The witness invoked his Fifth Amendment privilege in response to questions about his drug dealings.

38

We conclude that, in context, the invocation of the Fifth Amendment privilege hampered the defendant's exploration of only collateral issues, and moreover, the defendant's counsel was able to effectively pursue his lines of cross-examination and elicited from Mr. Kellogg a plethora of details about his drug dealing activities, including facts supporting an inference that Mr. Kellogg received prosecutorial forbearance in exchange for his testimony against the defendant. Essentially then, the defendant's claim of prejudice from the witness's mid-testimony perception of his privilege not to incriminate himself, even if prompted by the prosecutor's comment, is not supported in the record.

## XVII.  Prosecutorial Misconduct - Hindering Access to and Cooperation of Witness

The defendant asserts that the ability of defense counsel to effectively defend him was hampered by the misconduct of prosecutors in purposely denying defense counsel access to the state's most crucial witness, Ashley James, and in advising her not to talk with them.

The defendant relies on an affidavit by a private investigator, Ron Lax, who interviewed James after the defendant's trial had ended. According to Lax, James told him that she was "forced" to testify at the defendant's trial and that prosecutors had told her that "it would be in [her] best interest not to talk to the defense attorneys." The defendant further asserts that James was not disclosed as a state's witness until late June 2000 and went under the protection of the sheriff's office in early July where the state actively concealed her location, making it impossible for the defense to locate and interview her in the two-week interim.

Blount County Detective Bill Manuel testified that in the weeks before trial, Ms. James feared for her own safety. She requested and was provided protection by the sheriff's department. She was housed at motels in Knox and Loudon counties, accompanied by a deputy who stayed in an adjoining room. Detective Manuel further stated that deputies did not try to "control" Ms. James; she could freely come and go, she made telephone calls, received visitors and initially continued to work, with the deputy coming with her to and from her job site. Before trial, the prosecutors arranged a meeting in a conference room of the district attorney general's office between Ms. James and defense counsel. James, however, declined to speak with defense counsel. In post-trial testimony, James was questioned regarding what she reported to Investigator Lax and another investigator who interviewed her following the trial:

> Q:  Did you tell those two private investigators that Mr. Bailey and
> Ms. Andrews told you that it would be in your best interest not to talk
> to the defense attorneys of Mr. Copeland?
>
> A:  No.  They told me I did not have to speak to anyone I didn't want
> to.
>
> Q:  So, you were never told not to talk to us?

A: No. I was told you don't have to. That's it.

The trial court found, based on the post-trial testimony of James, there was no issue raised by the affidavit of Ron Lax that warranted a new trial:

> The court finds that Ashley James was not told by the prosecutors that it would be in her best interests not to talk to the defense attorneys. The court further finds that Ms. James was told by the prosecuting attorneys that she could speak with whomever she wished, but she was not required to speak with anyone.

This court has said,

> "An assessment of the witnesses' credibility by the trial court is essential in order for the trial court to determine whether the evidence is likely to change the result of the trial. The trial court may determine the credibility of any newly discovered evidence, and if the court concludes that the evidence would not be worthy of belief by the jury, the court should deny the motion for new trial."

*State v. Bowers*, 77 S.W.3d 776, 784 (Tenn. Crim. App. 2001). In the present case, the trial court credited Ashley James's post-trial testimony that prosecutors did not advise her not to speak with defense counsel.

Upon our review of the record, we find no abuse of discretion in the trial court's ruling. There is no indication that Ms. James would have agreed to an interview with defense counsel before the defendant's trial. Without such a showing, the defendant cannot establish that he was prejudiced by his inability to locate or interview her. Moreover, the defendant is unable to provide any authority showing a legal requirement that the state make James available to the defense. "Tennessee case law . . . gives a prospective witness the discretion to talk -- or not to talk -- to either counsel, as the witness sees fit. Of course, the law also provides that counsel may not instruct a witness not to discuss the facts of a case with opposing counsel." *State v. Singleton*, 853 S.W.2d 490, 493 (Tenn. 1993); *see also Gammon v. State*, 506 S.W.2d 188, 190 (Tenn. Crim. App. 1973). In this case, the defendant cannot establish his claim that the state actively hindered his access to James because, despite having no obligation to do so, the state arranged a pre-trial meeting between James and defense counsel. At this meeting, however, James exercised her privilege not to speak with defense counsel. Although "a defendant is entitled to have access to any prospective witness, . . . such right of access may not lead to an actual interview. . . . The importance of the rights of access is somewhat tempered by the witness's equally strong right to refuse to say anything." *Singleton*, 853 S.W.2d at 493 (citing *United States v. Scott*, 518 F.2d 261, 268 (6th Cir. 1975)).

The defendant failed to establish that prosecutors purposely denied access to or cooperation by Ashley James, thereby hindering his pre-trial preparation of his case. On the record

before us, we cannot conclude that the trial court erred in overruling his motion for new trial based on this issue.

## XVIII. Discovery Violations

The defendant asserts that the state failed to provide to the defense a transcript of witness Myron Kellogg's prior statement to law enforcement authorities in accordance with Tennessee Rule of Criminal Procedure 26.2. He concludes that he is entitled to a new trial.

Rule 26.2 requires disclosure of a witness's prior statement, commonly referred to as "*Jencks* material," when the statement "relates to the subject matter concerning which the witness has testified." Tenn. R. Crim. P. 26.2(a). In the present case, the state provided *Jencks* material consisting of a three-page summary of information provided in January 2000 by Mr. Kellogg, in his capacity as a confidential informant, to District Drug Task Force Agent Ronnie Talbott as related to FBI Agent Juanita Walls. The heading of the document notes that "[o]nly information related to the murder of Andre Jackson is contained herein." During Mr. Kellogg's testimony at trial, the prosecutor characterized the *Jencks* material provided to the defense as being the witness's statements "about this area of Mr. Kellogg's testimony." At that point in his direct examination, Mr. Kellogg was testifying concerning Ms. James's excited utterance. Although Agent Talbott testified that he had a transcript of his entire three-day interview with Mr. Kellogg in his office, the record does not reflect any attempt by the defense to have the complete transcript produced for further examination and a determination by the trial court of whether portions of the statement were appropriately withheld. *See* Tenn. R. Crim. P. 26.2(c).

As a result of his failure to seek the complete transcript, the defendant failed to place either the trial court or this court in a position of being able to determine whether any more of Mr. Kellogg's statement than that portion provided in exhibit 83 was related "to the subject matter concerning which the witness . . . testified" pursuant to Rule 26.2. Accordingly, the court concludes that the issue is waived. *See* Tenn. R. App. P. 36(a).

## XIX. Prosecutorial Misconduct - Coaching Witness's Testimony

The defendant argues that his due process rights, right to effective assistance of counsel, and right of confrontation were violated when a prosecutor improperly conferred with, advised, and coached testimony by witness Ashley James. The defendant further asserts that such conduct calls into question the good faith of the prosecution and should thus be considered as exculpatory evidence which the state failed to reveal to the defense during trial in violation of *Brady v. Maryland*.

The defendant asserts that he first learned of the alleged coaching of Ms. James at a post-trial hearing in the defendant's case. The defendant contends that in her cross-examination of Ms. James at the post-trial motion hearing, an assistant district attorney admitted that during a break following Ms. James's jury-out testimony she met privately with Ms. James and instructed her

41

regarding the emotions she should display during her testimony before the jury. We include the following relevant excerpts of Ms. James's testimony at the post-trial hearing.

On direct examination, defense counsel questioned the witness regarding her meeting with two private investigators in April 2001, after the defendant's trial:

> Q: During the course of talking to them, did you tell either of the private investigators that prior to your testimony in Mr. Copeland's case that you rehearsed and practiced your testimony on two occasions with prosecutors, Ms. Kirk Andrews and Mr. Bailey, who isn't here today?
>
> A: I told them that we went over things and we met several times to discuss, but I told them that they didn't tell me what to say, as they were trying to -- they were trying to make it seem like they told me what to say.
>
> Q: Did you tell those two gentlemen that prior to your testimony at Mr. Copeland's trial that you were told by the prosecuting attorneys what emotions to show during your testimony?
>
> A: They told me to try to show a little bit more emotion instead of being so angry and uptight and rude to whoever was questioning me.
>
> Q: Did you tell either of those gentlemen that Ms. Andrews asked you to cry during your testimony?
>
> A: She told me to try to show a little bit more emotion than I was.
>
> Q: But did you tell those gentlemen that she asked you to cry?
>
> A: I could have told them anything. I was ready to go home.
>
> Q: Are you telling me that you don't remember exactly what you told them?
>
> A: I don't remember exactly what I told them, but I could have told them that.
>
> . . . .
>
> Q: Did you tell -- now, I'm not asking you if this is true or not, but did you tell the private detectives that Mr. Bailey and Ms. Andrews

42

wanted you to testify to what Myron [Kellogg] said that you had told him instead of what you remembered had happened?

A: I believe I told them that we went over it several times and they kept asking me things that Myron had said, but they didn't try to make me change my story to what Myron had said.

Q: So, you wouldn't have told the two detectives that you were told by Mr. Bailey or Ms. Andrews to change your testimony to what Myron said?

A: I may have told them anything. They weren't anybody special to me. I could have told them anything.

Q: Well, are you saying that what you told them wasn't necessarily true?

A: Who, the private investigators?

Q: Yes, ma'am. Yes, ma'am.

A: I could have told them several lies. I wasn't under oath.

On cross-examination by the prosecutor, Ms. Andrews, Ms. James further testified as follows:

Q: There was a jury-out hearing during the trial of Mr. Copeland where I took you back into that little room, isn't that true, and Mr. Reed had been questioning you; do you remember that?

A: Yes, ma'am.

Q: And when I told you not to be rude and angry, I told you also that underlying anger a lot of times is sadness and fear; isn't that true?

A: Yes, ma'am.

Q: And I told you if you were going to show emotion, to show the sadness and not the anger, isn't that true?

A: Yes, ma'am.

Q: And I told you not to be rude; isn't that true?

43

A: Yes, ma'am.

Initially, the court notes that the defendant has offered no citation to authority specifically supporting his position that prosecutors' alleged "coaching" of Ms. James establishes a due process violation or a violation of the defendant's Sixth Amendment right to counsel. The primary focus of the defendant's argument appears to be that the claimed conduct violates Tennessee Rule of Evidence 615. The Rule applies to the sequestration of witnesses at trial and provides that the court "shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness." The defendant submits that permitting prosecutors to confer with Ms. James before she began testifying in the presence of the jury to "give pointers to the witness and improve on [her] testimony" defeats the purpose of Rule 615.

On review of the record, this court concludes, as did the trial court, that the alleged "coaching" consisted essentially of the prosecutor discussing with Ms. James her demeanor on the witness stand and advising her to curb her anger and avoid being rude. Even if the prosecutor's advice was properly characterized as "coaching," it certainly was not egregious. Further, there is no evidence in the record establishing that the defendant was prejudiced as a result of the prosecutor's discussion with her witness. That is, nothing in the record reflects any notable display of emotion or that Ms. James in fact cried while testifying, as the defense suggests she was prompted to do. Moreover, nothing in our review of Ms. James's testimony indicates that any information from the testimony of other witnesses was imparted to Ms. James by the prosecutor.

Last, the defendant asserts that the coaching of Ms. James hampered his ability to impeach Ms. James through cross-examination because the coaching was not revealed to the defense during James's testimony at trial. The defendant submits that the coaching is properly considered exculpatory information which the state was required to disclose to the defense under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963). In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87, 83 S. Ct. at 1196-97. Further, "[t]he Court has specifically held that evidence impeaching a government witness's credibility may be exculpatory within the meaning of *Brady*. 'When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule.'" *Hartman v. State*, 896 S.W.2d 94, 101 (Tenn. 1995) (quoting *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766 (1972)). In the present case, however, the defendant has not established that failing to disclose their discussion with James just before she testified before the jury constitutes evidence "favorable to [the] accused" under *Brady*. That is, the defendant has failed to cite to any portion of Ms. James's testimony to show when and/or how his earlier knowledge of the prosecutor's conduct with the witness could have been used by him to impeach Ms. James on cross-examination. Furthermore, the defendant has made no showing of prejudice resulting from the lack of such knowledge.

44

## XX. Introduction of Photographs

The defendant challenges the admission into evidence of Exhibit 40, a photograph of the victim taken in the examination room before the victim's autopsy. He asserts that other, less graphic photographs were available and that this particular photograph served only to inflame and prejudice the jury against him.

Before the medical examiner testified, the prosecutor noted that the state intended to introduce several photographs of the victim taken prior to his autopsy. The photographs of the victim lying on an examination table are taken from various angles and include close-up views of the areas surrounding his three gunshot wounds. Exhibit 40 shows the victim from the chest up, with trails of blood leading from his mouth and nose, and portions of his white tee-shirt being blood-soaked. On viewing and admitting that photograph, the trial court in allowing the photograph commented that "as pictures of dead people go, I don't think that's worse than any others I've seen, really. So it shows blood and the general condition of the body."

In *State v. Cole*, the Tennessee Supreme Court reviewed the law generally governing the admissibility of photographic evidence at trial. The court observed:

> Tennessee courts follow a policy of liberality in the admission of photographs in both civil and criminal cases. Accordingly, "the admissibility of photographs lies within the discretion of the trial court whose ruling . . . will not be overturned on appeal except upon a clear showing of an abuse of discretion." However, a photograph must be found relevant to an issue that the jury must decide before it may be admitted into evidence.
>
> Photographs of a corpse are generally admissible in murder prosecutions if they are relevant to the issues at trial, notwithstanding their gruesome character. Conversely, evidence which is not relevant to prove some part of the prosecution's case should not be admitted solely to inflame the jury and prejudice the defendant. "Photographs of the victim may be admitted as evidence of the brutality of the attack and the extent of force used against the victim, from which the jury could infer malice." The probative value of the photograph must outweigh any unfair prejudicial effect that it may have upon the trier of fact.

*Cole*, 155 S.W.3d at 912 (internal citations omitted).

In the present case, the pre-autopsy photographs of the victim, including Exhibit 40, supplemented the medical examiner's testimony and were relevant to proving the extent of the victim's injuries. *State v. Norris,* 874 S.W.2d 590, 597 (Tenn. Crim. App. 1993), *overruled on other grounds by Stater v. Imfeld*, 70 S.W.3d 698 (Tenn. 2002). Moreover, on viewing the photograph, we

agree with the trial court's assessment that it is not particularly gruesome.  Based on the foregoing, this court finds no error on the part of the trial court in admitting Exhibit 40.

## XXI.  Failure to Charge Theory of Self-Defense

The defendant claims prejudicial error in the refusal of the trial court to charge a theory of self-defense.  He asserts that the issue of self-defense was fairly raised by inferences which jurors could draw from testimony that one or more knives were present in the Delapp home as well as evidence of "unseen gunshots."

At trial, Sergeant Nitzband testified that a "kitchen-type knife, a steak knife" was found on the bathtub ledge next to the location of the victim's body.  In testifying, Stephanie Delapp explained that after she found her mother, she took a knife from the kitchen with her as she searched the house and ultimately located the victim on the bathroom floor.  In addition, Exhibit 36 depicted a knife next to a potted plant in the home.  As to gunshots, the defendant points to testimony of Edna Delapp that after the victim and another man exited the home, she went to her bedroom window and heard gunshots.  At the close of proof, the defendant requested that the jury be instructed on a self-defense theory based only on the evidence regarding the two knives.  The trial court rejected a self-defense instruction, concluding that nothing in the evidence "remotely raises self-defense. "

Before this court, the defendant argues that the jury could reasonably infer that the knife next to the bathtub could have belonged to the victim and that the gunshots could have been fired in response to the victim brandishing the knife while he was outside.

Our supreme court has observed that "[t]he evidence, not the theories of the parties, controls whether an instruction is required."  *State v. Allen*, 69 S.W.3d 181, 188 (Tenn. 2002).  To determine whether self-defense is fairly raised by the proof and must be explained to the jury, "a court must, in effect, consider the evidence in the light most favorable to the defendant, including drawing all reasonable inferences flowing from that evidence."  *State v. Shropshire*, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993).  A person is justified in using force against another person when he or she reasonably believes (1) that death or serious bodily injury is imminent and (2) that the force used is immediately necessary to protect against the other person's use or attempted use of unlawful force. *See* Tenn. Code Ann. § 39-11-611(a) (2003).

In this case, there was no evidence at all to indicate that the victim was ever in possession of either knife or any evidence of the victim's actions or behavior after he exited the house and was shot.  The trial court did not err in refusing to instruct the jury on a theory of self-defense.

## XXII.  Failure to Disqualify District Attorney's Office

The defendant asserts that the trial court erred in refusing to disqualify prosecutors based on an alleged conflict of interest discovered at the time of the hearing on the defendant's motion for new trial.  On October 25, 2001, during the pendency of the defendant's motion for new trial, the

defense filed a motion seeking to disqualify the prosecutors from further participation in the case based on information contained in an affidavit of Investigator Ron Lax regarding his interview with state's witness Ashley James on April 3, 2001. At the time of the interview, Mr. Lax was working as an investigator for the defense in the case of *State v. Reginald Stacy Sudderth*, in which Sudderth was being prosecuted for his role in the victim's murder. In his affidavit, Mr. Lax states that Ms. James made various assertions related to her testimony in the defendant's trial in July 2000, including that prosecutors Bailey and Andrews were aware that she was provided cocaine while being held in protective custody during the defendant's trial; that prosecutors wanted Ms. James to testify consistently with Myron Kellogg's version of events and not Ms. James's own version; that prosecutors advised her it was in her best interest not to speak with defense attorneys; and that prosecutors coached her testimony by telling her which emotions to display when she testified and specifically asked that she cry during her testimony. The defense argued that based on the contents of Mr. Lax's affidavit and the specific allegations of Ms. James set forth therein, that the prosecutors were disqualified from further participation in the defendant's case. The defendant noted that based on Mr. Lax's affidavit, the trial judge in the *Sudderth* case had ruled that prosecutors were disqualified from prosecuting Sudderth. Finally, the defense noted that disqualification of the prosecutors in both Sudderth's case and the defendant's case was supported by the Board of Professional Responsibility's advisory ethics opinion that the prosecutors could not ethically continue prosecution of the case in view of the potential conflict of interest created by Ms. James's allegations against them as well as the real possibility that the prosecutors would be called as witnesses at Sudderth's trial in the event Ms. James also testified as was expected.

Following a hearing, the trial court overruled the motion to disqualify prosecutors in the defendant's case. The trial court stated:

> The reason, in a nutshell, is that all of this came to light after the jury trial was already over. And the bulk of the motion for new trial had already been argued and resolved.
>
> . . . .
>
> So -- you know, if this was a trial -- if I was hearing this in relation to an upcoming trial on the merits, then my decision might be very different. But since the trial has already happened and she's not going to be testifying at trial and they're not going to be compelled to be called, then I think it's a totally different situation from Mr. Sudderth's case.

Subsequently, at the hearing on the motion for new trial, Ms. James in fact testified, and prosecutors did not. In denying the motion for new trial, the trial court apparently discredited the testimony of Ms. James, finding that "there are no issues raised in the affidavit of Mr. Lax that are supported by Ms. James's testimony and that warrant a new trial." Upon our review, we agree with the trial court that the considerations prompting the disqualification of the same prosecutors in

47

Sudderth's upcoming trial were not also present in the defendant's case in view of the fact that the defendant's trial was over, he had been convicted and sentenced, and there was no potential that prosecutors would be compelled to be witnesses at trial. Accordingly, this court finds no abuse of discretion in the trial court's overruling the motion to disqualify prosecutors from continuing to represent the state at the remainder of the hearing on the defendant's motion for new trial.

### XXIII. Failure to Relieve Defense Counsel from Post-Trial Representation of Defendant

The defendant argues that the trial court erred in refusing to permit trial counsel to withdraw and appoint new counsel to represent him at the hearing on his motion for new trial, despite evidence that counsel had an actual conflict of interest following the trial. In particular, the defendant notes that he filed a post-trial, *pro se* motion alleging ineffective assistance of counsel and a complaint against trial counsel with the Board of Professional Responsibility, and that defense counsel agreed that a conflict existed and also requested permission to withdraw.

The record reflects that before the start of the motion for new trial hearing, defense counsel advised the court that the defendant desired to raise a claim of ineffective assistance at that time. The defendant also personally advised the court that "[w]e have a little conflict of interest going on." The defendant explained to the court his belief that issues for future appellate review were not being properly preserved. The trial court explained to the defendant that the transcript of evidence would record most of the matters to be raised at the motion for new trial hearing and that he was entitled to a complete transcript of any proceedings necessary for preparing an appeal. Defense counsel further advised the court that they had received correspondence from the Board of Professional Responsibility indicating that the defendant's claim regarding counsel's performance at trial would be held in abeyance pending any post-conviction proceeding in his case. The trial court declined to permit counsel to withdraw, finding that new counsel would never be in as good a position to represent the defendant in the post-trial hearing "as the lawyers that sat here in this courtroom and fought this case."

The decision whether to allow counsel to withdraw in a pending criminal matter is vested in the sound discretion of the trial court, and the decision will not be reversed on appeal unless an abuse of discretion is shown. *State v. Branam*, 855 S.W.2d 563, 566 (Tenn. 1993); *State v. Russell*, 10 S.W.3d 270, 274 (Tenn. Crim. App. 1999); *State v. Melvin*, 913 S.W.2d 195, 201 (Tenn. Crim. App. 1995). The record reflects that defense counsel vigorously pursued the motion for new trial on behalf of the defendant, including filing four amendments. The record demonstrates no abuse of discretion in the trial court's requiring counsel to complete their representation of the defendant.

### XXIV. Newly Discovered Evidence

The defendant asserts that the trial court erred in overruling his motion for new trial based on newly discovered evidence. Specifically, he contends that post-trial testimony of Ashley James and statements attributed to her in an April 2001 interview with a defense investigator create the probability of acquittal and entitle him to a new trial. In particular, the defendant points to

48

contradictions in James's trial and post-trial testimony regarding James's drug use and her post-trial testimony contradicting Kellogg's assertions at trial that he did not tell James that she needed to discuss the events surrounding the murder with police to help Kellogg stay out of jail.

At trial, Ashley James testified that she had a relationship with Myron Kellogg since 1997. She admitted that she and Kellogg were sexually involved, that he supplied her with "powdered cocaine," and that he paid her living expenses. On cross-examination, James further testified as follows:

> Q: You came forward again -- you finally came forward, did you not, when Mr. Kellogg, this person that you have this cocaine relationship with, came with . . . this officer here and came to your work and threatened you, didn't he - - didn't they?
>
> A: I don't have a cocaine relationship with him. And he didn't come and threaten me at work.

In his trial testimony, Kellogg said that he was a former drug dealer with a conviction for a drug offense. He stated he had known James for about three years, and it was "possible" they had used drugs together and had a sexual relationship. Kellogg said he did not know whether James used crack cocaine but stated he had seen her with powder cocaine and did not know who had supplied it. In post-trial testimony, Kellogg denied supplying any cocaine to James while she was under protection before the defendant's trial. In contrast, James testified post-trial that Kellogg provided her with cocaine on three occasions before the defendant's trial when she was being protected . Asked how long before she testified at trial that she had consumed cocaine, James answered only that she became "really furious" with Kellogg about two and a half weeks before she testified and did not speak to him from that point on. In addition to her post-trial testimony, the defense relies upon the affidavit of Investigator Ron Lax introduced as an exhibit thereto. Therein, he also notes James as stating in his post-trial interview with her that she was introduced to drugs by Kellogg and became dependent on those he supplied to her and further, that while she was under the protection of the sheriff's office before the defendant's trial, that Kellogg provided her with drugs on three occasions.

The defendant characterizes James's post-trial statements in which she admitted that Kellogg was her supplier of drugs as "newly-discovered impeachment evidence," contradictory to her trial testimony in which she denied having a "cocaine relationship" with Kellogg. The state responds that because the defendant did not further develop James's testimony at trial, it is not clear what James meant when she denied a "cocaine relationship" with Mr. Kellogg. In a related issue, the defendant notes that Kellogg at trial denied putting any pressure on James to come forward with what she knew about the victim's murder to help Kellogg get out of trouble with the police. In post-trial testimony, however, James testified that Kellogg asked her to testify about the victim's murder to help him get out of jail on another matter. The defendant submits that such post-trial statements of James are directly contradictory to her testimony and that of Kellogg at trial and support reversal of his conviction and sentence and a new trial.

49

In ruling on the motion for new trial as to this issue, the trial court stated:

> Statements made by Ashley James to Detective Lax are not newly discovered. They are simply statements that could have been acquired by anyone who interviewed the witness. Ashley James's in court testimony fails to establish any credible newly discovered evidence that would justify a new trial in this case.

In *State v. Burns*, 777 S.W.2d 355, 360 (Tenn. Crim. App. 1989), this court said that the decision to grant or deny a new trial on the basis of newly discovered evidence rests within the sound discretion of the trial judge. *State v. Caldwell*, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997). On appeal, our standard of review is abuse of discretion. *State v. Meade*, 942 S.W.2d 561, 565 (Tenn. Crim. App. 1996). A new trial is a matter of right, however, when the defendant establishes the following:

> 1) reasonable diligence in seeking the newly discovered evidence;
> 2) materiality of the evidence; and
> 3) the evidence will likely change the result of the trial.

*State v. Goswick*, 656 S.W.2d 355, 358-59 (Tenn. 1983).

Initially, the defendant states that he was unable to obtain the newly discovered evidence in a more diligent manner because the identities of James and Kellogg were only disclosed seventeen days before trial. During this time, he asserts that James refused to speak to the defense, and Kellogg could not be located before trial. The defendant concludes that the newly discovered evidence concerning these two crucial state's witnesses creates the probability of his acquittal and supports a reversal of his conviction and sentence. Even assuming that due diligence was exercised by the defense, however, upon our reading of the transcript, we do not conclude that, as to her drug use, Ms. James's trial and post-trial testimony on this point is "newly discovered." It is not necessarily contradictory. We agree with the state's position that it is not clear what James meant when, at trial, she denied a "cocaine relationship" with Kellogg after first testifying that she had a serious cocaine habit and was supplied cocaine by Kellogg. The defendant did not further develop this testimony. Next, with respect to whether or not James felt pressured by Kellogg to come forward and report to authorities her knowledge of the victim's murder, the court concludes that the trial judge, faced with conflicting testimony by James and Kellogg, found credible the testimony of James. He was permitted to do so.

The record supports the determination of the trial court that no "newly discovered" evidence was presented which would support a new trial on this issue.

### XXV. Erroneous Instruction Regarding Aggravating Circumstance

As noted, the jury imposed the death sentence in the defendant's case based on its finding of the (I)(2) prior violent felony conviction circumstance as supported by the evidence of the defendant's 1998 aggravated robbery conviction. Aggravated robbery includes a robbery "[a]ccomplished with a deadly weapon" or a robbery "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-402 (2003).

During the penalty phase, the state introduced the indictment and judgment reflecting the defendant's prior conviction for aggravated robbery pursuant to his guilty plea. The indictment alleged that the defendant obtained personal items from the victim "by violence" and "with a deadly weapon, to-wit: a knife," and as a result, that the victim suffered serious bodily injury. In addition, the defendant testified on cross-examination to the circumstances of the aggravated robbery. The defendant admitted to testifying at his co-defendant's trial in that case that he knocked the victim to the ground, hit him while he was down, and kicked him. The defendant further agreed that he had previously testified that the victim's face was crushed "probably from the kicks or something." The defendant admitted that he had pleaded guilty to aggravated robbery in the case.

The trial court instructed the jury regarding the (I)(2) prior violent felony conviction aggravating circumstance. *See id.* § 39-13-204(I)(2). In relevant part, the court instructed jurors that "[t]he State is relying on the crime of aggravated robbery, which is a felony involving the use of violence to the person." The defendant contends that the jury was thereby erroneously instructed that the offense of aggravated robbery involves the use of violence as a matter of law in violation of his rights to due process and a trial by jury. He cites *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S. . 2428 (2002), in support.

In *State v. Cole*, 155 S.W.3d 885 (Tenn. 2005), our supreme court rejected the argument the defendant herein advances. As in the present case, the death sentence imposed against the defendant in *Cole* was also supported solely by the (I)(2) aggravating circumstance. En route to its holding, the court first noted that the trial court in instructing the jury that the defendant's prior convictions involved the use of violence to the person had followed the procedure set forth in *State v. Sims*, 45 S.W.3d 1 (Tenn. 2001). In that case, the court held:

> In determining whether the statutory elements of a prior felony conviction involve the use of violence against the person for purposes of § 39-13-204(I)(2), we hold that the trial judge must necessarily examine the facts underlying the prior felony if the statutory elements of that felony may be satisfied either with or without proof of violence.

*Id.* at 11-12. Next, the court in *Cole* considered the argument that the decisions of the United States Supreme Court in *Apprendi* and its progeny called into question the procedure outlined in *Sims*. The court held:

Clearly, [*Apprendi*] and its progeny preclude judges from finding "additional facts," *id*., that increase a defendant's sentence beyond the "statutory maximum," *id*., which is defined as the maximum sentence a judge may impose "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Id*. Equally as clear is that [*Apprendi*] and its progeny do not limit a judge's authority to make legal determinations that precede a jury's fact-finding and imposition of sentence.

The [*Sims*] procedure involves a legal determination, and as such this procedure does not transgress the dictates of [*Apprendi*] and its progeny. The (I)(2) aggravating circumstance requires only that the statutory elements of the prior felony involve the use of violence to the person. The [*Sims*] procedure authorizes trial judges merely to examine the facts, record, and evidence underlying the prior conviction to ascertain which "statutory elements" served as the basis of the prior felony conviction. This is a legal determination that neither requires nor allows trial judges to make factual findings as to whether the prior conviction involved violence. This legal determination is analogous to the preliminary questions trial judges often are called upon to decide when determining the admissibility of evidence. *See* Tenn. R. Evid. 104.

Furthermore, by making this legal determination, the trial court neither inflicts punishment nor usurps or infringes upon the jury's role as fact-finder. Once the trial court determines as a matter of law that the statutory elements of the prior convictions involve the use of violence, the jury must then determine as matters of fact whether the prosecution has proven the (I)(2) aggravating circumstance beyond a reasonable doubt and whether aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. The jury alone must decide these factual questions, and these are the factual questions that determine whether the maximum sentence of death will be imposed. Additionally, the facts underlying prior convictions are themselves facts that either were found by a jury's verdict of guilt or facts that were admitted by a plea of guilty. Permitting the trial judge to examine such facts merely to determine which of the statutory elements formed the basis of the prior conviction does not violate [*Apprendi*] and its progeny.

*Cole*, 155 S.W.3d at 903-04.

As discussed in *Cole*, the defendant's argument that the trial court usurped the role of

the jury in instructing the jury that the defendant's prior aggravated robbery conviction was a violent felony offense for purposes of the jury's consideration of whether the (I)(2) had been proven is unsupported by Tennessee law.

## XXVI.  Erroneous Instruction Regarding Reasonable Doubt

During both the guilt and sentencing phases of trial, the trial court instructed the jury on the concept of reasonable doubt as follows:

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt.  Reasonable doubt does not mean a doubt that may arise from possibility.  Absolute certainty is not demanded by the law, but moral certainty is required and this certainty is required as to every proposition of proof requisite to constitute the offense.

The defendant argues that the use of the "moral certainty" language constitutes reversible error because it leaves open the possibility that the jury decided the defendant's guilt on a lower standard of proof than that constitutionally required in criminal cases in violation of his due process rights under the standards set forth in *Cage v. Louisiana*, 498 U.S. 39, 111 S. Ct. 328 (1990) (per curiam), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475 (1991), and *Victor v. Nebraska*, 511 U.S. 1, 114. S. Ct. 1239 (1994).

In *Cage v. Louisiana*, the United States Supreme Court held constitutionally infirm an instruction equating "moral certainty" with the phrases "grave uncertainty" and "actual substantial doubt," concluding that these phrases suggested "a higher degree of doubt than is required for acquittal under the reasonable doubt standard."  *Cage*, 498 U.S. at 41, 111 S. Ct. at 329.  In *Victor v. Nebraska*, the Court further analyzed the relationship of the "moral certainty" language to the concept of reasonable doubt.  Although the Court opined that the term was outdated and did not encourage its use, when considered in the context of the instructions as a whole, the Court concluded there was "no reasonable likelihood that the jury would have understood moral certainty to be disassociated from the evidence in the case."  *Victor*, 511 U.S. at 16, 114 S. Ct. at 1248.

In *State v. Bush*, 942 S.W.2d 489, 521 (Tenn. 1997), the Tennessee Supreme Court upheld the use of the "moral certainty" language used together with the phrases "let the mind rest easily" and "arise from possibility" identical to the language of the instruction in the present case.  The court in *Bush* observed that although "neither of these phrases have been before the United States Supreme Court, the courts of this state have consistently upheld the constitutionality of this instruction."  *Id.* (citing *State v. Nichols*, 877 S.W.2d 722 (Tenn. 1994), *cert. denied*, 513 U.S. 1114, 115 S. Ct. 909 (1995)).  The court concluded that the challenged instruction did not violate the defendant's rights under either the United States Constitution or the Tennessee Constitution. Similarly, this court concludes that the reasonable doubt instruction in the defendant's case did not violate his due

53

process rights.

## XXVII. Funding for Mitigation Expert

On November 9, 1999, the trial court approved the defendant's request for $7,500 to cover the fees of Dr. Diana McCoy as a mitigation expert. At the time of a January 7, 2000 motions hearing, trial was set to begin on February 8, 2000. The funding the trial court had approved for Dr. McCoy had not yet also been approved by the Administrative Office of the Courts. Further, Dr. McCoy by affidavit had advised the trial court that she would need six months to prepare mitigation evidence. Defense counsel therefore requested a continuance of the trial in an effort to ensure that the mitigation evidence would be ready when and if it was needed immediately following the guilt phase. The court observed that when Dr. McCoy appeared at the November 9 hearing, there was no indication that she could not complete her work before the trial date, and it refused to permit her "to dictate the Court's docket." The court announced that it was therefore "un-approving Dr. McCoy in this case, both now and forevermore." The court advised defense counsel that in its view, "the ultimate mitigation experts are the lawyers" but acknowledged that counsel could "use other experts to help them gather information." The court requested that counsel inform the court what experts it would need and the estimated cost so that the court could "get the State to provide" what the defense needed to support its mitigation theories.

The defendant fails to note that at a subsequent hearing on April 11, 2000, Dr. McCoy appeared and testified to the work she had performed to date and what work was further required in preparing his mitigation case. Essentially, Dr. McCoy testified that she had performed psychological testing on the defendant, and from various records and information gathered had developed several possible mitigation themes. She testified that she had no witnesses yet, with the possible exception of the defendant's mother, and would require an additional $20,000 to develop other mitigation witnesses and explore the information already developed. The court ruled that it would not authorize the requested $20,000 but agreed to authorize, however, additional funds for Dr. McCoy to testify regarding her psychological findings, for "any additional psychological work" she deemed necessary with the defendant, and for reporting her findings and recommendations to defense counsel. The court stated that witness interviews should be conducted by investigators or defense counsel. In concluding, the court noted that although certain personal witness interviews by Dr. McCoy might be approved, it would not give "blanket approval for Dr. McCoy to investigate the case and interview all these witnesses until there's some showing that there's a need for it after some of the initial work has been done."

Considering the trial court's approval of further funding as clearly explained at the April 11 hearing, the defendant's assertion that the trial court "failed to comply with appropriate legal standards when it denied funding for Dr. McCoy" is not substantiated by the record. *See* Tenn. S. Ct. R. 13, §5(a)(1) (providing that trial court may authorize reasonable amount of funding for expert services upon its determination that such services are necessary to ensure protection of indigent defendant's constitutional rights).

## XXVIII Victim Impact Evidence[4]

The defendant challenges the admission of testimony at sentencing by Elizabeth Faye Dean, the victim's aunt and sister of the victim's mother. The defendant asserts that Ms. Dean's testimony should not have been permitted because she is not a member of the victim's "immediate" family and her testimony did not relate to any unique characteristics of the victim or the impact of the victim's death on his immediate family. He concludes that the testimony's prejudicial impact outweighed any probative value.

After first hearing the testimony outside the jury's presence, the trial court allowed victim impact evidence from Ms. Dean. Generally, Ms. Dean testified that she was close to the victim and missed him every day. She said that his death had "about driven [her] crazy," and that "a part of her heart has been tore out . . . ." She further stated that his death had affected her own two sons, who were close to the victim. She said that at times she had to take her children in her arms and "just rock them and just pray."

The introduction of "victim impact" evidence is not precluded by either the United States Constitution or the Tennessee Constitution in a capital sentencing proceeding. *See Payne v. Tennessee*, 501 U.S. 808, 827, 111 S. Ct. 2597, 2609, (1991); *State v. Nesbit*, 978 S.W.2d 872, 889 (Tenn. 1998). As the United States Supreme Court has explained:

> We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. "[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."

*Payne*, 501 U.S. at 825, 111 S. Ct. at 2608 (alteration in original) (emphasis added) (citation omitted).

The Tennessee Supreme Court has provided guidance on the nature and extent of evidence that may be introduced under the theory of "victim impact" evidence:

> Generally, victim impact evidence should be limited to information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the

---

[4]This issue is set forth in the brief of the appellant at page 234 and appears to have been inadvertently left unnumbered as a separate issue.

contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's immediate family.

*Nesbit*, 978 S.W.2d at 891 (citations omitted). There is no "bright-line test, and the admissibility of specific types of victim impact evidence must be determined on a case-by-case basis." *Id.* Our supreme court has cautioned, however, that such evidence, and prosecutorial argument based on the evidence, should be closely scrutinized and restrained so as not to be unduly prejudicial or appeal to the emotions or sympathies of the jury. *Id.* at 891-92; *see also State v. Smith*, 993 S.W.2d 6, 14 (Tenn. 1999).

The statutory provision on the issue of victim impact evidence limits such evidence to the testimony of members of the victim's family:

> The court may permit a member or members, or a representative or representatives of the victim's family to testify at the sentencing hearing about the victim and about the impact of the murder on the family of the victim and other relevant persons.

Tenn. Code Ann. § 39-13-204(c) (2003).

The principles outlined in the above case law, however, are not categorically restrictive. Our supreme court has identified three types of victim impact evidence: (1) information designed to provide a "brief glimpse" into the life of the victim; (2) the contemporaneous and prospective circumstances surrounding the victim's death; and (3) the financial, emotional, psychological, and physical effects on the victim's family. *Nesbit*, 978 S.W.2d at 891; *see also Payne*, 501 U.S. at 825, 111 S. Ct. at 2608 ("[T]he victim is an individual whose death represents a unique loss to society and in particular to his family."). The statutory provision essentially identifies the third of these categories. *See* Tenn. Code Ann. § 39-13-204(c) (2003). The statute does not expressly restrict or limit the introduction of other types of victim impact evidence authorized by law developed in our prior cases. *State v. McKinney*, 74 S.W.3d 291, 309 (Tenn. 2002). Thus, Ms. Dean's testimony was properly admitted.

## XXIX. Introduction of Photograph of Victim

During her testimony in the sentencing phase, the victim's mother displayed a large, color, portrait-style photograph of the victim taken two years before his death. The defendant contends that the photograph was irrelevant to the determination of punishment and served only to elicit an emotional reaction from the jury. The defendant urges that the photograph's prejudicial impact clearly outweighed its probative value, if any, and supports setting aside his sentence of death and remanding for a new sentencing hearing.

The admission of photographs is generally discretionary with the trial court and, absent an abuse of that discretion, will not result in the grant of a new trial. *See State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978). In *State v. Dicks*, 615 S.W.2d 126 (Tenn. 1981), the death-sentenced defendant challenged the admission of "before and after" photographs of the murder victim at trial. The Tennessee Supreme Court held there was no prejudicial error in the admission of the photographs, "though it would have been better had the 'before' picture of Mr. Keegan been excluded since it added little or nothing to the sum total of knowledge of the jury." *Id*. at 128.

In the present case, we agree with the defendant that the photograph was not evidence admissible as "relating to the circumstances of the murder, or the aggravating circumstances relied upon by the State, or any mitigating circumstances." *State v. Teague*, 897 S.W.2d 248, 250 (Tenn. 1995). We observe, however, that in addition to displaying the photograph and recalling the victim as a "sweet, loving child" with a beautiful smile, his mother also testified to the trouble he had been in at the time of his death, including drugs and his possible involvement in the rape of Lynn Porter, and her efforts to help her son turn his life around and "start over." Ultimately, as in *Dicks*, we conclude that the admission of the photograph did not prejudice the defendant.

### XXX. Cumulative Effects of Errors at Sentencing

There are no multiple sentencing errors to accumulate.

### XXXI. Cumulative Effect of Errors at Trial

As discussed above, the failure of the trial court to conduct an inquiry into whether the defendant waived his right to testify in his own defense during the guilt phase of his trial necessitates remand for a hearing. Because we find no other errors to be combined for our consideration, there are no multiple trial errors to accumulate.

### XXXII. Constitutional Challenges to Statutory Death Penalty Provisions

The defendant raises various constitutional challenges to the death penalty provisions under Tennessee law. He specifically asserts that relevant sections of the death penalty law violate the 8th and 14th Amendments to the United States Constitution and Article I, sections 8 and 16 of the Tennessee Constitution. As an intermediate court, however, this court is bound by previous decisions of the Tennessee Supreme Court rejecting each of these challenges, and we thus decline to consider them anew.

A. The defendant asserts that the death penalty by lethal injection or any other means constitutes cruel and unusual punishment. This argument has been previously rejected. *See State v. Keen*, 31 S.W.3d 196, 233 (Tenn. 2000), *cert. denied*, 532 U.S. 907, 121 S. Ct. 1233 (2001); *State v. Pike*, 978 S.W.2d 904, 925 (Tenn. 1998), *cert. denied*, 526 U.S. 1147, 119 S. Ct. 2025 (1999); *Nesbit*, 978 S.W.2d at 902-03; *State v. Vann*, 976 S.W.2d 93, 118 (Tenn. 1998), *cert. denied*, 526 U.S. 1071, 119 S. Ct. 1467 (1999); *State v. Blanton*, 975 S.W.2d 269, 286 (Tenn.

1998), *cert. denied*, 525 U.S. 1180, 119 S. Ct. 1118 (1999); *State v. Cribbs*, 967 S.W.2d 773, 796 (Tenn. 1998), *cert. denied*, 525 U.S. 932, 119 S. Ct. 343 (1998); *State v. Cauthern*, 967 S.W.2d 726, 751 (Tenn. 1998), *cert. denied* , 525 U.S. 967, 119 S. Ct. 414 (1998); *State v. Brimmer*, 876 S.W.2d 75, 88 (Tenn. 1994).

B. The defendant asserts that Tennessee's death penalty statute fails to sufficiently narrow the population of death-eligible defendants among those defendants convicted of first degree murder. This argument has been repeatedly rejected. *See Terry v. State*, 46 S.W.3d 147, 169 (Tenn. 2001) (Appendix), *reh'g denied* (Tenn. May 18, 2001), *cert. denied*, 534 U.S. 1023, 122 S. Ct. 553 (2001); *State v. Vann*, 976 S.W.2d 93, 117-118 (Tenn. 1998) (Appendix), *cert. denied*, 526 U.S. 1071, 119 S. Ct. 1467 (1999); *State v. Keen*, 926 S.W.2d 727, 742 (Tenn. 1994).

C. The defendant contends that the death penalty provisions do not sufficiently limit the exercise of the jury's discretion. In particular, he asserts that the statute permits the jury to impose the death sentence no matter what mitigating evidence is shown. Consistent with the decision in *State v. Smith*, 857 S.W.2d 1, 21-22 (Tenn. 1993), we reject this argument. *See also Franklin v. Lynaugh*, 487 U.S. 164, 178-80, 108 S. Ct. 2320, 2330 (1988); *State v. Hurley*, 876 S.W.2d 57, 69 (Tenn. 1993).

D. The defendant contends that the statute requires the jury to impose a death sentence if the aggravating circumstances are found to outweigh the mitigating evidence. He concludes that this "mechanistic" and "mandatory" imposition of the death penalty discourages jurors from making the ultimate determination that death is the appropriate penalty on a case-by-case basis. The Tennessee Supreme Court has specifically rejected this argument. In *State v. Boyd*, 797 S.W.2d 589, 596 (Tenn. 1990), the court observed that the "statute, taken in its entirety, does not in any way unconstitutionally deprive the sentencer of the discretion mandated by the individualized sentence requirements of the constitution."

E. The defendant challenges the statute's failure to inform a jury that it may impose a life sentence out of mercy, thereby essentially allowing mercy for the defendant only if a defendant presents sufficient mitigating evidence to outweigh any aggravating circumstances. Our appellate courts have consistently rejected the argument that the "mercy instruction" is required at a capital sentencing hearing. *See Cauthern*, 967 S.W.2d at 749; *State v. Bigbee*, 885 S.W.2d 797, 813-14 (Tenn. 1994); *Cazes*, 875 S.W.2d at 269 n.6.

F. The defendant argues that the statute is unconstitutional in failing to inform the jury of the consequences of its failure to reach a unanimous verdict in the penalty phase. This argument has been repeatedly rejected. *See Terry*, 46 S.W.3d at 170; *Brimmer*, 876 S.W.2d at 87; *Cazes*, 875 S.W.2d at 268; *Smith*, 857 S.W.2d at 22- 23.

G. The defendant contends that the statute in excluding from jury service certain classes of persons, including those convicted of certain offenses, persons of unsound mind and habitual

58

drunkards, Tennessee Code Annotated section 22-1-102(a), violates his due process rights and his right to trial by a fair and impartial jury of his peers. That section    provides:

> The following persons are incompetent to act as jurors:
>
> > (1) Persons convicted of certain infamous offenses, specially designated in this code;
>
> > (2) Persons convicted of any offense involving the theft of property or services or any offense punishable as theft as graded by § 39-14-105;
>
> > (3) Persons convicted of perjury or subordination of perjury; or
>
> > (4) Persons of unsound mind and habitual drunkards.

Tenn. Code Ann. § 22-1-102(a) (1994). As we have mentioned earlier in this opinion, when a defendant is entitled to a jury trial, the jury must be selected from a cross-representative pool of prospective jurors. *State v. Bell*, 745 S.W.2d 858, 860 (Tenn. 1988). A finding of an absence of cross-representation, however, must be predicated upon the excluded group's being a "distinctive" group in the community. *Duren v. Missouri*, 439 U.S. 357, 363, 99 S. Ct. 664, 668 (1979); *State v. Buck*, 670 S.W.2d 600, 610 (Tenn. 1984). We discern no basis in our governing law that recognizes certain felons, persons of unsound mind, or habitual drunkards as distinctive groups for purposes of the cross-representation requirement, and the defendant cites no authority that supports the claim. Thus, we discern no constitutional violation.

### XXXIII. Exclusion of Jurors Based on their Religious Beliefs

The defendant argues that the exclusion of prospective jurors who stated during voir dire that their religious beliefs prevented them from imposing the death penalty violates his rights to equal protection, due process, and a trial by jury. He acknowledges that the Tennessee Supreme Court in *State v. Reid*, 91 S.W.3d 247 (Tenn. 2002), decided this issue adversely to his position but presents it here to preserve the issue for further appellate review. In *Wolf v. Sundquist*, 955 S.W.2d 626, 629 (Tenn. Ct. App. 1997), the Court of Appeals stated:

> It is now settled that a criminal defendant's constitutional rights are not violated by excusing prospective jurors for cause when their personal beliefs concerning the death penalty would prevent or substantially impair their performance as a juror in accordance with their instructions and their oath.

In *Reid*, the court agreed with the cited rationale of *Wolf* as being dispositive of this issue. *Reid*, 91

S.W.3d at 290 (Appendix). *Wolf* as approved in *Reid* is dispositive of this issue.

## XXXIV. Denial of Separate Juries to Determine Guilt and Sentencing

The trial court denied the defendant's motion to have separate juries determine his guilt and his sentence. He acknowledges that the Tennessee Supreme Court has rejected his argument that separate juries are necessary to protect his right to a fair trial, but he raises the issue to preserve it for further appellate review. *See Dellinger*, 79 S.W.3d at 478-79. In *Dellinger*, the court stated, "We cannot agree that the mere fact that a jury has convicted a defendant of first degree murder automatically renders that jury incapable of impartially deciding whether to impose a death sentence." *Id.* Moreover, as the court further observed, "a trial court does not have any discretion to grant a motion for separate juries during the guilt and sentencing phases of trial. Indeed, Tennessee law specifically requires that following a conviction for first degree murder, a 'sentencing hearing shall be conducted as soon as practicable before the same jury that determined guilt.'" *See* Tenn. Code Ann. § 39-13-204(a) (2003). *Dellinger* is dispositive of the claim in the present case.

## XXXV. Allowing State to Make Final Closing Argument in Penalty Phase

The defendant asserts that although the state has the burden of proving that any aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt at sentencing, "the real burden is on the defendant whose life hangs in the balance, and he should have the opportunity to argue last." As the state correctly notes, the defendant has failed to cite to any authority in support of this argument. Moreover, the defendant acknowledges case law to the contrary but intends to preserve this issue for further review. We conclude that the following decisions in which our supreme court has repeatedly rejected this issue are dispositive of the claim in the present case. *See State v. Odom*, 137 S.W.3d 572, 602 (Tenn. 2004); *Brimmer*, 876 S.W.2d at 87; *Cazes*, 875 S.W.2d at 269; *Smith*, 857 S.W.2d at 24; *State v. Caughron*, 855 S.W.2d 526, 542 (Tenn. 1993).

## XXXVI. Death Penalty Statute Unconstitutional - Allows Sentence Based on Hearsay Evidence

The defendant asserts that Tennessee Code Annotated section 39-13-204(c) is unconstitutional "because it allows the death penalty to be imposed based on hearsay and other evidence that is not subject to the guarantees of reliability and trustworthiness required by the due process and confrontation clauses of the federal constitution." The defendant notes that this court effectively rejected this argument in upholding the constitutionality of the challenged statute in *State v. Gdongalay Berry*, No. M2001-02023-CCA-R3-DD, slip op at 8-9 (Tenn. Crim. App., Nashville, Apr. 10, 2003). Based upon *Gdongalay Berry*, we reject this claim.

## XXXVII. Mandatory Review

Tennessee Code Annotated section 39-13-206(c)(1) (2003) mandates that this court

60

determine: (1) whether the sentence of death was imposed in any arbitrary fashion; (2) whether the evidence supports the jury's finding of statutory aggravating circumstances; (3) whether the evidence supports the jury's finding that aggravating circumstances outweigh any mitigating circumstances; and (4) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

The evidence is sufficient to support the jury's finding of the aggravating circumstance that the defendant had been convicted of a prior violent felony, *see* Tenn. Code Ann. § 39-13-204(I)(2) (2003), beyond a reasonable doubt, and the evidence supports the jury's conclusion that the aggravating circumstance outweighs the mitigating circumstances beyond a reasonable doubt.

That said, we recognize a problem with the aptness of the aggravating factor in the present case in which the defendant may have been convicted upon a theory of criminal responsibility for the act of another.

Although the defendant's role was major and his sentence in this case does not offend the Eighth Amendment to the United States Constitution, *see generally Tison v. Arizona*, 481 U.S. 137, 107 S. Ct. 1676 (1987); *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368 (1982), and even though the defendant is clearly criminally responsible for any gunshots fired by any companions, *see* Tenn. Code Ann. § 39-11-402(2) (2003) (establishing criminal responsibility for the act of another when the person on trial, [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense), the (I)(2) factor may not be applicable in the present case in view of the defendant's possible complicity or vicarious criminal liability. In *Owens v. State*, 13 S.W.3d 742 (Tenn. Crim. App. 1999), this court said that "[c]ertain aggravators focus clearly on the defendant's own actions or intent and contemplate consideration of the defendant's individual actions in determining the most culpable capital defendants. Alternatively, other statutory aggravators, by their plain language, clearly encompass consideration of the nature and circumstances of the crime itself, permitting vicarious application." *Id.* at 763 n.13. In *Johnson v. State*, 38 S.W.3d 52 (Tenn. 2001), our supreme court said,

> Without some proof that the defendant in some way "knowingly created" the "great risk of death," [the (I)(3)] aggravating circumstance does not apply, even though a great risk of death may have been created by someone during the course of the criminal episode. Because this aggravating circumstance focuses more upon the defendant's actions and intent rather than upon the actual circumstances surrounding the killing, we decline to accept the State's invitation to vicariously apply the (I)(3) aggravating circumstance, that the (I)(3) factor, creating a risk of death to persons other than the victim of the murder.

61

*Id.* at 63. In *State v. Robinson*, 146 S.W.3d 469 (Tenn. 2004), the high court applied the *Johnson* rule to the vicarious application of the (I)(5) especially heinous, atrocious, or cruel factor and determined that because the statutory language [of the (I)(5) factor] focuses upon the nature and circumstances of the crime, rather than the actions, intent, and conduct of the defendant, the factor may be vicariously applied. *Robinson*, 146 S.W.3d at 500. We recognize that factor (I)(2) dealing with a defendant's record of prior violent felonies focuses upon the defendant and not upon the nature of the crime under consideration, and as such, the factor may not be applicable in a case such as the one before us where the defendants liability for the offense may be vicarious.

This legal issue has not been raised, however, in the defendant's brief, and the state has not briefed the issue. We are unwilling to treat it as plain error because, as we shall explain below, we otherwise determine that the death penalty must be vacated. *See State v. Adkisson*, 889 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (listing as a requirement for plain error review, *inter alia*, that consideration of the error is necessary to do substantial justice); *see also State v. Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (adopting the *Adkisson* test and stating that the presence of all *Adkisson* factors are necessary for noticing plain error).

Thus, we hold that the sentence of death in the present case was not arbitrarily applied.

We now undertake the statutorily mandated proportionality review. *See* Tenn. Code Ann. § 39-13-206(c)(1)(D) (2003) (requiring the reviewing court to determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant). As we will explain, we hold that the death penalty in the present case is disproportionate to the penalty imposed in similar cases.

The statutory comparative proportionality is different from traditional Eighth Amendment proportionality analysis, which is the abstract evaluation of the appropriateness of a sentence for a particular crime. *Pulley v. Harris*, 465 U.S. 37, 42-43, 104 S. Ct. 871, 875 (1984). Statutory comparative proportionality review presumes that the death penalty is not disproportionate to the crime in the traditional sense. It purports to inquire instead whether the penalty is nonetheless unacceptable in a particular case because it is disproportionate to the punishment imposed on others convicted of the same crime. *State v. Godsey*, 60 S.W.3d 759, 781 (Tenn. 2001).

The reviewing court employs the precedent-seeking method of analysis. *Godsey*, 60 S.W.3d. at 782; *see also State v. Bland*, 958 S.W.2d 651, 665 (Tenn. 1997). This approach requires careful consideration and examination of the case on appeal and other cases in which the defendants were convicted of the same or similar crimes. We examine the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating factors involved. *Godsey*, 60 S.W.3d at 782; *Bland*, 958 S.W.2d at 664. The reviewing court does not search for proof that a defendant's death sentence is perfectly symmetrical with the penalty imposed in all other first degree murder cases, but to identify and invalidate the aberrant death sentence. *Godsey*, 60 S.W.3d at 782. "Simply stated, if the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases

in which the death penalty has been imposed, the sentence of death is disproportionate. . . . Comparative proportionality review is simply a final safeguard in the initial appellate process to ensure that no aberrant death sentence is affirmed." *Id.* at 782-83.

The reviewing court selects similar cases for comparative proportionality from a pool that includes only those first degree murder cases in which (1) the state sought the death penalty, (2) a capital sentencing hearing was held, and (3) the sentencing jury determined whether the sentence should be life imprisonment, life imprisonment without the possibility of parole, or death, regardless of the sentence actually imposed. *Id.* at 783.

"Comparative proportionality review . . . is not a search for disproportionate or aberrant life cases. . . . [E]ven if a defendant receives a death sentence when the circumstances of the offense are similar to those of an offense for which a defendant has received a life sentence, the death sentence is not disproportionate where the Court can discern some basis for the lesser sentence." *Id.* at 784; *see Bland*, 958 S.W.2d at 665. "Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the [death] penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice." *Godsey*, 60 S.W.3d at 784-85 (quoting *Gregg v. Georgia*, 428 U.S. 153, 203, 96 S. Ct. 2909, 2939); *see also Robinson*, 146 S.W.3d at 502.

The appellate court reviews Supreme Court Rule 12 reports, which are merely a starting point when conducting comparative proportionality review. *Godsey*, 60 S.W.3d at 785. The court supplements its Rule 12 review by traditional methods of legal research, which enable us to locate written appellate court opinions, which generally are available on first degree murder cases included within the pool for comparison. *Id.* However, the reviewing court does not employ a statistical analysis that attempts to quantify the various factors leading to imposition or non-imposition of the death penalty. *Bland*, 958 S.W.2d at 664. Comparative proportionality review is not a rigid, objective test which employs mathematical or scientific techniques. *Id.* at 668. As previously explained, a sentence of death is not disproportionate, unless, the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed. *Godsey*, 60 S.W.3d at 785.

The reviewing court considers many variables including: (1) the means of death; (2) the manner of death (*e.g.*, violent, torturous); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. *Bland*, 958 S.W.2d at 667. Several criteria are relevant to a comparison of the characteristics of defendants which include: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's

knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation. *Id.*

In the present case, both the victim and the defendant are youthful African American males. At the time of the offense, the defendant was 25 years old, and the victim was 18. They were acquainted and apparently shared in the same community social circles. The defendant had a seven-year-old son. He acknowledged that a five-month period was the longest continuous time he had not been incarcerated since he was 14 years old. He admitted his convictions of theft of property valued at over $10,000, reckless endangerment, and aggravated robbery. The latter offense served as the basis for the state's use of the prior violent felony aggravating factor as the sole ground for imposing the penalty of death. *See* Tenn. Code Ann. § 39-13-204(I)(2) (2003) (death penalty impositions must be based upon the presence of certain factors, one of which is that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person) ((I)(2) factor). The defendant testified in the sentencing phase of his trial that the aggravated robbery conviction resulted from his best interests guilty plea, but he acknowledged that the robbery victim's face was crushed probably from "kicks." The present conviction offense is based upon the victim's death following three gunshot wounds, two of which were fatal. Although the defendant was identified as the person who came to the victim's residence and exited with the victim, neither the nature of the confrontation immediately preceding the shooting nor the identity of the shooter is known. The defendant's role in the homicide was motivated by a $10,000 reward offer. The reward was offered because the victim allegedly raped the offeror's girlfriend.

To evaluate proportionality in the present case, we have examined prior cases from the prescribed pool in which a single victim was killed via gunshot not committed in the perpetration of another felony and when the defendant and the victim shared the same race and gender and a similar age. We have also considered the defendants' prior criminal record, their role in the homicide, and the use of the (I)(2) factor in imposing the death penalty.[5]

In the initial portion of our search, we attempted to identify cases bearing these characteristics and in which the death penalty was imposed.

In *State v. Robinson*, 146 S.W.3d 469 (Tenn. 2004), the 23-year-old African American male victim was captured by a Memphis gang and accused of serving as a look-out for a rival gang. He was held for one and a half to two and a half hours and was interrogated and beaten. Afterward, the 37-year-old African American male defendant and other gang members took the victim to a public park and shot him to death. *Id.* at 474-75. In its proportionality analysis, our supreme court referred to the homicide as an execution-style first degree murder. *Id.* at 502. The supreme court determined that the evidence supported the jury's application of the heinous, atrocious, or cruel factor and the murder committed in the perpetration of a felony factor. *See* Tenn. Code Ann. § 39-13-204(I)(2), (7) (2003).

---

[5]Some of the information presented in the identified cases emanates from Rule 12 reports.

In *State v. Dellinger*, 79 S.W.3d 458 (Tenn. 2002), the co-defendants received the death penalty following their conviction of first degree premeditated murder of the victim. The Caucasian co-defendants, who were ages 4l and 27, shot the 24-year-old Caucasian male victim in the head with a shotgun. The death penalty was imposed based upon the (I)(2) factor; the co-defendants had been convicted of the first degree murder of a female whose body was discovered only four days following the discovery of the body of the victim of the conviction offense. *Id.* at 764-65.

In *State v. McKinney*, 74 S.W.3d 291 (Tenn. 2002), the 23-year-old African American male became disgruntled about his confrontation with the victim, an off-duty Memphis police officer who was serving as a security officer at a nightclub at the time. After being told by an on-duty Memphis police officer to leave the nightclub, the defendant later returned, walked up behind the unarmed victim, and shot him in the back of the head. The death penalty was imposed based upon the (I)(2) factor; the defendant had been convicted of aggravated robbery. *Id.* at 312.

In *State v. Terry*, 46 S.W.3d 147 (Tenn. 2001), the defendant received the death penalty following his shooting the victim. The defendant, who had no prior criminal record, was a minister, and the victim was a handyman at the church. The defendant committed the murder as a means of faking his own death to avoid prosecution for the theft of church funds, and the death penalty was based upon the application of two aggravating factors. *See* Tenn. Code Ann. § 39-13-204(I)(5) (the murder was especially heinous, atrocious, or cruel), (6) (murder was committed for purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution).

In *State v. Christopher Scott Beckham*, No. 02C01-9406-CR-00107 (Tenn. Crim. App., Jackson, Sept. 27, 1995), the death penalty was imposed when a 27-year-old white male defendant, who had no prior record, shot and killed a former co-worker, a 21-year-old white male victim. The death penalty was based upon the especially heinous, atrocious, or cruel aggravating factor. The defendant was a bouncer at a topless lounge who suspected the victim of involvement in funds missing from the lounge. The defendant used handcuffs to kidnap the victim and transport him to the place of execution.

In *State v. Taylor*, 774 S.W.2d 163 (Tenn. 1989), the defendant was convicted of first degree premeditated murder in the shooting death of a friend. After nodding to another friend, the friend shot the victim in the head; the defendant shoved the victim out of the car in which they were riding and shot the victim as he lay on the street. The defendant and his accomplice stole the victim's shoes and money. *Id.* at 164-65. The jury sentenced Taylor to death, finding that the murder was committed during the commission of robbery and that Taylor had a prior violent felony conviction, robbery with a deadly weapon. *Id.* at 164, 166.

In *State v. Coker*, 746 S.W.2d 167 (Tenn. 1987), *overruled in part on other grounds by State v. West*, 19 S.W.3d 753 (Tenn. 2000), the 40-year-old Caucasian male defendant shot the 52-year-old Caucasian male victim for remuneration. The victim was legally blind. *Id.* at 169-70. The death penalty was imposed based upon the (I)(2) factor.

In *State v. Martin*, 702 S.W.2d 560 (Tenn. 1985), *overruled by State v. Brown*, 836 S.W.2d 530 (Tenn. 1992), the 33-year-old African American male defendant shot and killed the 45-year-old African American male victim.[6] The victim was a respected member of the community. *Id.* at 562. The basis for the imposition of the death penalty was the (I)(2) factor; the defendant had previously been convicted of second degree murder.

In *State v. Caldwell*, 671 S.W.2d 459 (Tenn. 1984), the defendant shot an acquaintance in the back of the head with a shotgun. Apparently, the defendant believed the victim may have been having an affair with his wife. *Id.* at 462. The jury sentenced the defendant to death based upon the prior violent felony aggravating circumstance; the defendant had previously been convicted of murder in the first degree. *Id.* at 462, 464-65.

In *State v. Moore*, 614 S.W.2d 348 (Tenn. 1981), the defendant was convicted of first degree murder after abducting a former roommate at gunpoint and shooting him twice in the head and once in the chest. *Id.* at 349. After concealing the body in underbrush, the defendant returned two days later to shoot away the victim's hands, feet, face, and teeth with a shotgun for the purpose of preventing identification of the body. *Id.* The jury imposed the death penalty based upon its finding that the murder was committed during the commission of a kidnapping, *see* Tenn. Code Ann. § 39-13-204(I)(7) (2003), and that the defendant was previously convicted of a violent felony pursuant to the (I)(2) factor. The defendant had previously been convicted of robbery with a deadly weapon and first degree burglary.

Among these identified cases in which the death penalty was imposed, *McKinney* bears the strongest resemblance to the present case. The victim and the defendant were of the same race and gender, and the defendant McKinney was close to the present defendant's age. Both defendants were sentenced to death via the (I)(2) factor, and both had garnered convictions of aggravated robbery. That aside, however, we discern a distinction in the victim's circumstances. In *McKinney*, the victim was a police officer, although he was not on official duty at the time of his death. The prosecution in *McKinney* offered evidence of the victim's contributions to his family, profession, and community. *McKinney*, 74 S.W.3d at 309-10. The victim was a well-respected peace officer who had achieved stature as a mediator. *Id.* In contrast, the victim in the present case, though youthful, had languished in the drug culture, and evidence presented in the guilt phase of the defendant's trial pointed toward him as one of the men who raped Sudderth's girlfriend. Still, we recognize the statistical similarities of the two cases.

Although in each of these identified death penalty cases, the defendant was convicted of a single premeditated homicide via gunshot, we find at last one meaningful distinction between each of them and the present case, *McKinney* aside.

In *Robinson*, the defendant was a 37-year-old gang member. The victim was

---

[6] In contrast to the Rule 12 report, the opinion in *Martin* states that the defendant was 36 years of age, which was his apparent age at the time of trial. *See Martin*, 702 S.W.2d at 562.

tortured for about two hours before he was executed. The manner of his death was indeed especially heinous, atrocious, *and* cruel: He was first disemboweled with a shotgun blast. He was then shot in the head after he begged for his life. The jury found the presence of *two* aggravating factors, including that the murder was committed during the perpetration of a kidnapping.

In *Dellinger*, the (I)(2) factor was utilized based upon the defendant's convictions of killing a second victim, a female, within a few days of killing the victim of the conviction offense. The killing of the second victim was factually related to the conviction homicide. In our view, the fact and nature of the prior violent felony was particularly palpable.

In *Terry*, the egregious facts included that the 43-year-old, Caucasion male defendant embezzled funds from the church of which he was a minister and that he killed the 32-year-old Caucasian male victim, a church handyman, as a means of faking his own death and avoiding detection and capture as the thief. Although the defendant shot the victim in the head after luring him to the church under the pretext of taking him on a fishing trip, he decapitated the victim, removed one hand, and removed the skin from the victim's forearm in order to obliterate a tattoo. The defendant dressed the body in the defendant's clothes, burned the church where the body had been left, and fled on a motorcycle that he had purchased and secreted for the purpose of effecting his disappearance. Although the defendant had no prior criminal record, two aggravating factors were applied, both of which were gruesomely apt.

In *Christopher Scott Beckham*, the defendant had no prior criminal record. Although the evidence showed that the defendant killed the victim during the commission of a kidnapping, the jury rejected the (I)(7) aggravating factor, that the murder was committed during the perpetration of a felony, and applied the (I)(5) factor, that the murder was especially heinous, atrocious, or cruel. In an attachment to the *Beckham* Rule 12 report, the trial judge stated, to be candid, the aggravator found by the jury was extremely weak and the Court was quite reluctant to charge this to them. [Had the court determined that the thirteenth juror rule would apply to the sentencing determination,] this might have been a case in which such intercession by the Court would have been appropriate. Although in the present case before this court the (I)(5) is not involved, we believe that the *Christopher Scott Beckham* trial judge's comments reflect upon the relative egregiousness of the homicide in that case. Furthermore, on direct appeal in *Christopher Scott Beckham*, this court held that the evidence was insufficient to support application of the (I)(5) factor. *See Christopher Scott Beckham*, slip op. at 27. In light of that holding, this court "decline[d] the opportunity to review the other sentencing issues." *Id.*, slip op. at 28. We remanded the case to the trial court for imposition of a life sentence. *Id.*

In *Taylor*, the jury applied the (I)(2) factor but also applied the (I)(7) factor, based upon the defendant robbing the victim.

In *Coker*, remuneration was involved, as in the present case, but the victim was blind. Furthermore, in Coker's post-conviction proceeding, the post-conviction court found that the capital sentencing hearing was fatally flawed and remanded for a new sentencing hearing. *See Rocky Lee*

*Coker v. State*, No. 01C01-9804-CC-00152, slip op. at 2-3 (Tenn. Crim. App., Nashville, Apr. 21, 1999) (commenting on post-conviction court's finding and adjudication). From the Rule 12 report, we glean that, upon remand, the defendant received a life sentence.

In *Martin* and *Caldwell* the juries applied the (I)(2) factor, but the prior violent felonies were homicides. Martin had been convicted previously of second degree murder and Caldwell of first degree murder. As an aside, we note that the supreme court in *Martin* reversed the capital conviction based upon an instructional error. *See Martin*, 702 S.W.2d at 564-65. We found no reference to the disposition of the case on remand.

In *Moore*, the supreme court reversed the death sentence because the prior convictions of arson and second degree burglary failed to support the use of the (I)(2) factor. *See Moore*, 614 S.W.2d at 351-52.

Although the capital convictions rested upon the theory of premeditation in these cases, we note that in *Robinson*, *Christopher Scott Beckham*, and *Taylor*, the evidence showed that the homicides were committed during the perpetration of other felonies. We believe that these circumstances set these cases apart from those wherein no other criminal offenses were perpetrated upon the victims. We note that the death penalty has been much more typically imposed in first degree murder cases by gunshot when the homicide was committed in the perpetration of another felony. *See, e.g., State v. Powers*, 101 S.W.3d 383 (Tenn. 2003) (defendant kidnapped and robbed female victim and hit her in head before shooting her); *State v. Stout*, 46 S.W.3d 689 (Tenn. 2001) (20-year-old defendant shot female victim during kidnapping and robbery); *State v. Sims*, 45 S.W.3d 1 (Tenn. 2001) (24-year-old male beat then shot burglary victim); *State v. Hurley*, 876 S.W.2d 57 (Tenn. 1993) (although conviction premised on premeditated murder, defendant shot and robbed victim before burning his body and truck); *State v. Williams*, 657 S.W.2d 405 (Tenn. 1983) (defendant beat and shot a priest during a burglary); *State v. Laney*, 654 S.W.2d 383 (Tenn. 1983) (defendant robbed and shot a storekeeper in the victim's driveway); *see also State v. Davis*, 141 S.W.3d 600, 621 (Tenn. 2004) (court commenting that it has frequently upheld the death penalty in first degree murder cases involving shooting offenses committed in the course of a robbery or other felony).

Also, we have distinguished the present case from those in which the victim was a female, *see, e.g., Powers*, 101 S.W.3d at 404 (examining cases wherein victim was a female, including *Stout*, *State v. Bates*, 804 S.W.2d 868 (Tenn. 1991), and *State v. King*, 718 S.W.2d 241 (Tenn. 1986)), or in which the victim held a unique status, *see, e.g., State v. McKinney*, 74 S.W.3d 291 (Tenn. 2002) (defendant shot police officer/security guard who was well respected in the community); *State v. Henderson*, 24 S.W.3d 307 (Tenn. 2000) (24-year-old defendant killed unconscious police officer during a bid to escape custody). In several cases, the death penalty was imposed when the victim was female *and* the homicide was committed during the perpetration of another felony. *See, e.g., State v. Smith*, 993 S.W.2d 6 (Tenn. 1999) (during store robbery 23-year-old male defendant shot female proprietor); *State v. Nesbit*, 978 S.W.2d 872 (Tenn. 1998) (19-year-old male defendant held, burned, and beat 20-year-old female victim for six hours before shooting

68

her); *State v. Harries*, 657 S.W.2d 414 (Tenn. 1983) (defendant killed female store clerk during robbery).

Additionally, we notice that the death penalty is more typically imposed when the defendant kills or attempts to kill by gunshot more than one victim. *See, e.g., State v. Davis*, 141 S.W.3d 600 (Tenn. 2004) (during robbery, 18-year-old male defendant actively involved in shooting two victims in head); *State v. Burns*, 979 S.W.2d 276 (Tenn. 1998) (defendant shot two persons and attempted to shoot a third); *State v. Cribbs*, 967 S.W.2d 773 (Tenn. 1998) (during burglary, defendant shot victim's husband then killed unconscious victim with shotgun blast to the head); *State v. Bland*, 958 S.W.2d 651 (Tenn. 1997) (defendant shot fleeing victim and shot a second person during a robbery attempt). We also notice that in many such cases, the killing coincided with the commission of another felony. *See, e.g., Davis*, *Cribbs*, *Bland*.

In view of the foregoing analysis, it becomes apparent to us that, except for the presence of a prior violent felony, the circumstances of the present case bear none of the exacerbating indicia that seemingly justified the death penalty in other gunshot-inflicted homicides. Although we do not search for disproportionate or aberrant life sentences, we notice that the rubric of cases from the defined pool in which the circumstances are more akin to, if not more egregious than, the present case resulted more typically in non-capital sentences. *See, e.g., State v. Qawi Nur*, No. W2004-01259-CCA-R3-CD (Tenn. Crim. App., Jackson, June 21, 2005) (while trying to flee burglary attempt, defendant shot burglary victim); *State v. Michael Lynn Stanton*, No. E2003-02675-CCA-R3-CD (Tenn. Crim. App., Knoxville, Apr. 15, 2005) (life without parole; defendant violated protective order in entering estranged wife's residence and fatally shot her father); *State v. Andrew Thomas*, No. W2001-02701-CCA-R3-DD (Tenn. Crim. App., Jackson, Feb. 27, 2004) (19-year-old African American male co-defendant shot armored car driver during robbery); *State v. Howard Coleman*, No. W2002-01485-CCA-R3-CD (Tenn. Crim. App., Jackson, Jan. 12, 2004) (30-year-old African American male shot and killed 34-year-old African American male in robbery); *State v. Trent Stark*, No. W2002-03078-CCA-R3-CD (Tenn. Crim. App., Jackson, Dec. 5, 2003) (19-year-old African American male defendant shot 19-year-old African American male victim apparently because victim refused the defendant a hit off the victim's cigar); *State v. Geraldrick Jones*, No. W2002-00747-CCA-R3-CD (Tenn. Crim. App., Jackson, Oct. 17, 2003) (25-year-old African American male defendant shot female date then dismembered her body to avoid detection); *State v. William J. Ford*, No. W2000-01205-CCA-R3-CD (Tenn. Crim. App., Jackson, July 12, 2002) (gang-member defendant fired 10 shots into crowd of school children and killed 15-year-old victim); *State v. Charles Thompson*, No. W1998-00351-CCA-R10-CD (Tenn. Crim. App., Jackson, Aug. 9, 2001) (incarcerated gang leader commanded shooting execution of correctional officer); *State v. Kevin Wilkins*, No. W1999-01462-CCA-MR3-CD (Tenn. Crim. App., Jackson, Aug. 18, 2000) (21-year-old African American male accomplice of defendant in *Robinson*); *State v. Prentiss Phillips*, No.W2000-00245-CCA-R3-CD (Tenn. Crim. App., Jackson, Mar. 9, 2001) (accomplice of defendant in *Robinson*); *State v. Torrance Johnson*, No. 02C01-9704-CR-00150 (Tenn. Crim. App., Jackson, Mar. 15, 1999) (defendant shot female patron of an automatic teller machine).

That said, we are quick to recognize, however, that the use of the (I)(2) aggravating

69

factor in the present case is an important marker for assessing the proportionality of death sentences. *See Davis,* 141 S.W.3d at 621 ("[T]he prior violent felony aggravating circumstance . . . is more qualitatively persuasive and objectively reliable than other[] aggravating circumstances.") (quoting *State v. Howell*, 868 S.W.2d 238, 262 (Tenn. 1993)); *Dellinger*, 79 S.W.3d at 476 ("There have been several previous cases involving shooting deaths of friends or acquaintances in which the death penalty was imposed based upon the prior violent felony aggravating circumstance."). In this respect, a prior murder is obviously the most serious of violent felonies and is the most suggestive in a first degree murder for which a defendant is being sentenced. Thus, a prior murder conviction is uniquely persuasive as a predicate for imposing the death penalty. *See, e.g., Dellinger*, 79 S.W.3d 476 ("The very significant distinguishing factor in this case, however, is the use of the prior conviction for Branam's murder as an aggravating factor in sentencing for Griffin's murder."). *See generally Martin*, 702 S.W.2d, 560; *Caldwell*, 671 S.W.2d 459. To be sure, however, death penalties have been premised on other felonies, especially when the accused had garnered multiple prior violent felony convictions. *See, e.g., Powers*, 101 S.W.3d at 404 (defendant previously convicted of three aggravated assaults, robbery, and assault with a deadly weapon upon a federal officer); *McKinney*, 74 S.W.3d at 299 (defendant previously convicted of aggravated assault and adjudicated guilty of aggravated assaults as a juvenile); *Sims*, 45 S.W.3d at 19 (defendant previously convicted of two aggravated assaults); *Smith*, 993 S.W.2d at 9 (defendant previously convicted of murder and two robberies). On the other hand, in some of the analogous cases we listed above in which the jury eschewed the death penalty, the state had sought the death penalty solely based on the (I)(2) aggravating factor. *See Trent Stark*, *Andrew Thomas*, *Torrance R. Johnson*.

In the present case, the application of the (I)(2) factor was based upon a single prior conviction, aggravated robbery. Apparently, this offense did not involve the use of a deadly weapon. Still, we believe that the prior felony in the present case would be weighty enough to support the capital sentence in this case if, on balance, other factors meaningfully supported the sentence. In that regard, although we have considered the specter of remuneration in the present case and find that it exacerbates the homicide, we are charged to consider whether provocation contributed to the homicide, and in that vein, we recognize that the collaborators in the killing were motivated by the victim's alleged rape of Sudderth's girlfriend. Thus, the provocation issue slightly abates the enhancement resulting from the reward being offered and sought. Additionally, we have considered the absence of another coinciding felony and the similar ages and like gender and race of the defendant and victim. With the various dynamics somewhat in equipoise, we turn to the role of the defendant.

Concerning the latter circumstance, we conclude that the defendant's possible complicity role in the homicide tips the scale toward a conclusion that the death penalty in this case is disproportionate. In sum, the defendant's role in the homicide, though major, may have been vicarious; no other felonies were committed in the course of the homicide, with the result that the victim was not a happenstance target of some other felony; the defendant and/or some of his compatriots believed the homicide was justified; and the persuasiveness of the defendant's prior violent felony was not overwhelming. Essentially, unless we are willing to indulge the imposition of the death penalty in any premeditated shooting homicide in which the accused has any prior

conviction of a felony involving violence, we must adjudicate the penalty in this case disproportionate.

The sentence of death must, therefore, be vacated. The cause is remanded for a new sentencing hearing should the trial court determine that *Momon* error was not committed or is harmless. We note that our adjudication on the proportionality of the death sentence is not predicated upon the insufficiency of the evidence of the aggravating factor, *cf. Christopher Scott Beckham*, slip op. at 28 & n.6 (upon adjudicating insufficiency of evidence to support the aggravating factor, remanding for imposition of life sentence, the sanction of life without the possibility of parole being inapplicable based upon the date of the offense), and we commend to the trial court *State v. Harris*, 919 S.W.2d 323, 331 (Tenn. 1996) (authorizing state on remand to seek to establish new aggravating factors in a new capital sentencing hearing).

                                                 
_____
JAMES CURWOOD WITT, JR., JUDGE